Kimberly MACK, Plaintiffs,

v.

The TOWN OF WALLKILL, James Coscette, individually and in his capacity as Police Chief of the Town of Wallkill, Police Officer Steven Kuhn, Sr., Individually and in his capacity as a Police Officer for the Town of Wallkill and Police Officer Adam Bruce, Individually and in his capacity as a Police Officer for the Town of Wallkill, Defendants.

No. 00 CIV. 8965(CM).

United States District Court,
S.D. New York.

Feb. 24, 2003.

Alan D. Levine, Kew Gardens, NY, for plaintiff.

Garrett P. Lewis, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY, for defendants Kuhn and Bruce.

Andrew R. Lind, Friedman, Hirschen, Miller, Schenectady, NY, for defendant Coscette.

Monte J. Rosenstein, Middletown, NY, for the Town of Wallkill.

### DECISION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

This is an action brought under 42 U.S.C. § 1983. Plaintiff claims she was falsely arrested and maliciously prosecuted by members of the Town of Wallkill Police Department. The Town of Wallkill moves post discovery for an order pursuant to Rule 12(b) and Rule 56 of the Federal Rules of Civil Procedure dismissing the complaint and/or granting summary judgment in its favor, on the ground that it cannot be held liable for the actions of the officer defendants. Individual defendants James Coscette and Adam Bruce, but not Steven Kuhn, have also filed motions for summary judgment. Officer Bruce argues, *inter alia*, that the complaint must be dismissed as against him because he is

entitled to qualified immunity as a matter of law.

*The Facts*

In the early morning hours of October 17, 1997, plaintiff, Kimberly Mack, was on her way to her home at 39 Black Stallion Court in Wallkill. She had left her house a few minutes earlier to get some cash from an ATM and to buy Tylenol. When Mack arrived at the store, she realized she had left her ATM card at home. She went back to get it. (Mack deposition 57–59).

About the same time, Officer Kuhn was dispatched to Black Stallion Court to investigate an incident involving a male who lived at the same address—39 Black Stallion Court. This individual had allegedly tried to force a vehicle operated by Travis D. Williams of Tri–City Auto Recovery off the road. At the time of the incident, Mr. Williams was trying to repossess a car owned by someone at the 39 Black Stallion Court address. The male under investigation used a 1983 BMW registered to plaintiff to try to force Mr. Williams off the road. (Bruce Aff't ¶¶ 5–6). Ms. Mack, who is obviously not a male, was never charged with any offense arising out of the road incident; indeed, there is no evidence that she was even questioned about it.

According to plaintiff, as she turned on to Black Stallion Court (a cul-de-sac), a car with its headlights on (Car # 1) followed her and another vehicle with its headlights on (Car # 2) was ahead of her on the Cul-de-sac, motionless. (Mack deposition at 19–27). As she drove toward Car # 2, the driver (who she later learned was Police Officer Kuhn) put on his flashing lights. *Id.* Realizing that Car # 2 was a police vehicle, she stopped her car in such a way that her driver's side door was right next to Kuhn's driver's side door, while her car and Kuhn's car were pointed in opposite directions. *Id.*

Kuhn said something, but Mack could not hear him at first because her engine was still running. *Id.* at 28. Eventually, she heard Kuhn say that he couldn't hear her, and that he wanted her to pull over and turn off the car. *Id.* Seeing a parking space behind her, she started to back up her car. At that point, according to Mack, Car # 1 (driven by Bruce), which had followed her onto Black Stallion Court, moved forward and "rammed" her vehicle. *Id.*

Plaintiff states that, after the collision, she put her car in park, and turned off the engine. She then saw a man dressed in a police uniform (subsequently identified as Officer Bruce) get out of the car that just hit hers, and approach the passenger side window of her car with his gun drawn. (Mack deposition at 35–40). Mack alleges that Bruce aimed his gun directly at her and said, "I'll blow your mother fucking head off. Don't move, I'll blow your fucking head off." (*Id.* at 43). At this same time she says that Kuhn came up to the driver's side of her vehicle, also with gun drawn and aimed at her head, saying, "Get out of the fucking car now bitch. Get out of the fucking car now. Don't you hear me? Get out of the mother fucking car now!" (*Id.* at 45–47).

In response to the conflicting instructions from the officers, plaintiff claims that she put her hands up to show the police officers that she did not have a weapon and asked them not to shoot her. (*Id.* at 47–48). She then operated the mechanism to unlocked the doors to her car. As soon as the doors were unlocked, Kuhn opened the driver's side door, while Bruce opened the passenger side door. (*Id.* at 48–54). When she removed her seatbelt, Kuhn pulled her out of the car, pulled her to the back of the car, pushed her face forward onto the trunk and handcuffed her behind her back. (*Id.* at 54–56 and 60–62). Ms. Mack told him, "Please, please you are hurting me. My leg, my back, you are

hurting me." Officer Kuhn replied, "Shut the fuck up, you fucking cunt. Bitch, I said shut up already, are you deaf or are you just stupid?" In response to her cries of pain about her leg and back, Kuhn replied, "I don't give a fuck. Just shut the fuck up." *Id.* When she asked Kuhn why he had handcuffed her and why he was hurting her when she had not done anything wrong, he kept saying, "You hit the fucking car." (*Id.* at). Mack responded, "I didn't hit anything. You rammed me. You rammed me. You rammed me." (*Id.* at 65). After she was handcuffed Ms. Mack was able to see that the rear bumper of her car was in contact with the front bumper of a police car. She says that she saw no discernable damage to either vehicle. (*Id.* at 67). Kuhn then placed Mack in his vehicle, took her to the Wallkill Police Station, and placed her in a holding cell. (*Id.* at 70–81).

The officers' version of what transpired on Black Stallion Court differs from plaintiff's. In particular, the moving officer, Police Officer Bruce, testified that he was sent by his superior, Police Officer Scheuering, to back up Officer Kuhn. (Bruce deposition at 17–22). It appears from Bruce's deposition testimony that Scheuering imparted little detail to Bruce about the incident to which he was responding. When asked why he was responding to Black Stalion Court, Bruce responded: "I believe it was to back up Officer Kuhn, who, at that point in time, was investigating a complaint filed by a gentleman who was attempting to re-pos-

sess a vehicle that night, in the area." (*Id.* at 17). However, Bruce did testify that he had no prior knowledge of any problem involving Ms. Mack. (*Id.* at 19).

When Bruce arrived at Black Stallion Court, he observed plaintiff in her BMW vehicle backing up toward the street exit for a distance of approximately 7 to 8 car lengths. (*Id.* at 24). He stopped his police vehicle in an effort to block the roadway. (*Id.* at 23 and 27). Bruce says that Kuhn apparently also tried to block the road, by driving his RMP around both Mack's and Bruce's vehicles, coming to a halt behind Bruce but sideways across the road. (*Id.* at 26). Police Officer Bruce says that he blew his air horn in an effort to get plaintiff to stop her car (*Id.* at 28), but plaintiff continued to back up her vehicle towards Officer Bruce, eventually maneuvering her car around his and colliding with Police Officer Kuhn's vehicle. (*Id.* at 28–31). Bruce concedes that when Mack's car was backing up, it moved at a speed of only one or two miles an hour. (*Id.* at 24).

Bruce states that, while Kuhn was transporting Mack back to the station, he remained with plaintiff's vehicle until it was towed to the Wallkill impound yard. Bruce says that he turned over the impound sheet to Kuhn back at the station house and went back on patrol. He had no other contact with the situation. (Bruce deposition at 43–49).[1]

There is no dispute that Officer Kuhn transported Mack to the Wallkill Police Station and placed her in a holding cell.

---

1. Bruce's deposition testimony is notable for his criticism of Kuhn and Chief Coscette. Bruce testified that he objected to the way then Police Chief Coscette ran the Wallkill Police Department. He said he resigned from the department because he did not want to be associated with Coscette and certain other Wallkill police officers. (Bruce deposition at 10–11 and 50–51). About Officer Kuhn, Bruce stated that he can be "over aggressive

at times, maybe to make up for his lack of physical ability." He also expressed reservations about Kuhn's knowledge of the law. (*Id.* at 53–56). Bruce's distancing himself from the Wallkill Police Department might have been a strategic move, since the Department happens to be under this Court's supervision—with a court-appointed monitor policing the police.

While there, Mack claims to have overheard conversations between Kuhn and other police department employees. She heard Kuhn say his car was damaged. She also heard Kuhn make two telephone calls to defendant Coscette, who at the time was Police Chief in the Town of Wallkill. Mack did not hear what Coscette said, but she heard Kuhn tell his co-workers that Coscette had directed him to report enough damage to the police car so that Mack could be charged with felony criminal mischief as a result of the contact between the two vehicles. Mack also overheard Kuhn saying that Coscette promised to "square it with the tow truck guy." (Mack deposition at 81–82 and 111–117). Coscette for his part testified that he had no recollection whatsoever of speaking with Kuhn on the night of the incident, or of forwarding or being involved with a claim to Mack's insurance carrier. (Coscette deposition at 51–52 and 58–65).

Sometime latter Kuhn removed Mack from the holding cell, placed her in his police vehicle and drove her, at a high rate of speed, through a heavily wooded area. Several times during this ride Ms. Mack asked Kuhn where she was being taken. Each time he replied by telling her to "shut the fuck up" and calling her a "stupid nigger," a "fucking cunt" and "black bitch." Finally, they arrived at a parking lot, where a man dressed in pajamas and an overcoat approached the car. He, it turned out, was the Town Justice. While Mack sat in the back seat of the police vehicle with the window rolled down, she was arraigned on the charge of criminal mischief in the third degree, a felony, and two traffic violations. The judge set bail of $1,500. Kuhn then drove Mack back to the police station, where she was held until she could be shackled and taken to the Orange County Jail (where, as this Court well knows, all bail in Orange County must be posted, see *Lee v. Perez*, 175 F.Supp.2d 673, 675 (S.D.N.Y.2001)). The following

morning, a friend of Ms. Mack came to the jail and bailed her out. (Mack deposition at 82–84, 88–90).

Several days after being released, Ms. Mack went to the town's police headquarters where Police Officer Ari Moscovitz permitted her to make a videotape of the Town of Wallkill police vehicle that was allegedly damaged in the incident. Ms. Mack observed no damage to the front bumper of the vehicle. The Town of Wallkill, however, submitted a claim to Ms. Mack's insurance company, State Farm, for damage in the amount of $640.50. When a State Farm appraiser went to look at the alleged damage, the car was not available for his inspection. When the appraiser returned two days later, he was shown a police car with damage to its rear bumper, not the front bumper that Mack supposedly hit. Nevertheless, State Farm paid the claim in the amount of $270—despite Ms. Mack's protests to her carrier that a fraud was being perpetrated. (Id. at 127–45; Mack Ex. C—[State Farm claim file]).

On March 4, 1998, the charge of criminal mischief in the third degree was reduced to a charge of criminal mischief in the fourth degree on the motion of the Orange County District Attorney's Office. Subsequently, on March 24, 1999, Judge Freehill of Town of Wallkill Justice Court dismissed the criminal mischief charge against Ms Mack, upon the grounds that "reading the Accusatory Instrument as a whole, ... the statutory requirements providing for allegations of a non-hearsay nature have not been complied with." (Bruce Exh. I).

*Summary Judgment*

On a motion for summary judgment, the movant is entitled to judgment as a matter of law if there are no genuine issues of material fact. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a genuine issue for trial exists such that a reasonable jury could find in favor of the non-movant, then summary judgment must be denied. *See Id.* at 248, 106 S.Ct. 2505. The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-movant. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142, (1970); *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993).

Here, the moving parties are defendants Wallkill, Coscette, and Bruce. I therefore view the facts most favorably to plaintiff which means that I assume, for purposes of this motion, that her version of the story is true. Thus, for purposes of this motion, plaintiff, responding to a direct order from a police officer, backed up her car extremely slowly (I assume that no more than one or two miles per hour), until she was rammed from the rear by Bruce's RMP. Neither her car nor Bruce's RMP was perceptibly damaged by this collision. However, at that point—having done absolutely nothing that could possibly give rise to probable cause, or even reasonable suspicion—she was arrested at gunpoint by Kuhn and Bruce. She was told they were arresting her because she "hit the fucking car." She was cuffed and taken to the station, arraigned on a charged of criminal mischief in the third degree, and thereafter carted off to the County Jail.

On this version of the facts, none of the three moving defendants is entitled to summary judgment on the false arrest claim. However, defendants are entitled to summary judgment on the malicious prosecution claim. The Monell claim against Coscette and the Town also survives summary judgment.

■ *Officer Bruce.* As should be apparent from the above, there are virtually no undisputed facts in this case. Viewing the vehemently disputed facts most favorably to plaintiff, a trier of fact could conclude that there was no probable cause to arrest plaintiff, and that Bruce violated plaintiff's civil rights by participating in her arrest and searching her automobile without probable cause to believe her guilty of any crime. There is no evidence that Officer Bruce had probable cause to suspect plaintiff of committing any crime prior to the time she turned onto Black Stallion Court. Her responding to a police officer's order to park a car—which necessitated backing up her car—is not a crime and could in no way be construed as being a crime. Traveling one to two miles per hour, which is how fast Officer Bruce suggests Mack's car was traveling, is not unlawful and could not reasonably have been perceived as unlawful. And it is not against the law to have your car rammed by a police officer's RMP. Thus, viewing the facts most favorably to plaintiff there was no probable cause to arrest her.

[2] To the extent that Bruce argues that he cannot be held liable because he did not participate in arresting plaintiff, he is in error. His assertion that he did not assist in Mack's arrest is directly controverted by Mack's deposition testimony that, at the same time Kuhn was standing at her drivers side window, Bruce was standing at the passenger side window pointing his weapon at her and ordering her not to move. She further testified that when Kuhn pulled her out of her car, Bruce searched her car. Mack's allegations are sufficient to support an inference that Bruce actively assisted and participated in her arrest. *See, e.g. Day v. Morgenthau,* 909 F.2d 75, 77–78 (2d Cir.1990) (assistant district attorney who directed a court officer to arrest plaintiff is properly alleged to have participated in arrest); *Carin v. City of New York,* 1998 WL 60952 at *3 (S.D.N.Y.1998) (genuine issue of materi-

al fact exists as to whether police officer who rode in van with arresting officer and plaintiff and verbally abused plaintiff participated in arrest). The fact that Bruce stayed behind to impound Mack's vehicle, and thus did not accompany plaintiff and Kuhn to the station house, does not mean that Bruce's behavior during plaintiff's apprehension was not part of the arrest process.

Even if the Court were to conclude that Bruce did not actively participate in Mack's arrest, he may nonetheless be liable under § 1983 for his failure to intervene in an unlawful arrest. It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988); *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986); *Webb v. Hiykel,* 713 F.2d 405, 408 (8th Cir.1983); *Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir.1982), cert. denied, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); *Byrd v. Brishke,* 466 F.2d 6, 11 (7th Cir.1972). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, *see O'Neill,* 839 F.2d at 11–12; (2) **that a citizen has been unjustifiably arrested,** *see Gagnon v. Ball,* 696 F.2d 17, 21 (2d Cir.1982); or (3) that any constitutional violation has been committed by a law enforcement official, *see O'Neill,* 839 F.2d at 11." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)(emphasis added). Liability will attach if the officer had a realistic opportunity to intervene to prevent the harm from occurring. *See O'Neill,* 839 F.2d at 11–12. Given the nature of the disputed facts in this case, the determination of whether Bruce was capable of pre-venting Kuhn from arresting Mack is an issue of fact for the jury. *Id.*

Bruce argues in the alternative that, even in the absence of probable cause to arrest, he is nonetheless protected by qualified immunity for his actions.

Whether an official is entitled to qualified immunity requires a two part analysis. The threshold question is whether, "Taken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the Court determines that the officer's conduct did not violate a constitutional right, the analysis ends. *Id.* at 201, 121 S.Ct. 2151. If the conduct does infringe a constitutional right, the Court must determine "whether the right was clearly established" at the time it was allegedly infringed. *Id.*

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. "[A] defendant is entitled to summary judgment on qualified immunity grounds when 'no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right.' " *Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir.1995) (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)). "An officer's actions are objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances." *Id.*

When "the factual record is not in serious dispute .... [t]he ultimate legal

determination whether ... a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide." *Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.) cert. denied, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990). The problem here is that the factual record *is* in serious dispute, which precludes the Court from making the ultimate legal determination of whether a reasonable police officer would have believed he had probable cause to arrest Ms. Mack.

The right not to be arrested or have one's vehicle searched without probable cause was clearly established at the time of Mack's arrest. *See Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."). Thus, the dispositive question here is whether the circumstances surrounding the arrest of Ms. Mack would have made it objectively reasonable for Officer Bruce to believe that arresting her did not violate the law. *See Loria v. Gorman,* 306 F.3d 1271, 1286 (2nd Cir.2002).

Bruce argues that he is entitled to qualified immunity because a reasonable officer in his position might well have drawn the conclusion that plaintiff was fleeing the scene. Suspicion of flight would give rise to some level of suspicion, if not to probable cause, that would at a minimum justify stopping her vehicle, perhaps even with weapon drawn, to make further inquiry. However, viewing the facts most favorably to plaintiff—i.e., accepting her story that all she was doing was following Officer Kuhn's order to park her car—a reasonable officer in Bruce's position (i.e., an officer who saw no crime being committed and had no information suggesting that plaintiff had committed a crime) could and should have cleared up any confusion by asking plaintiff and Officer Kuhn what was going on. If there were any evidence that he made such an inquiry, then (depending on Kuhn's responses) Bruce might well be entitled to qualified immunity—even if Officer Kuhn lied or misled Bruce about why plaintiff was backing her car up. However, on the record before me, there is no evidence that Bruce asked for clarification, and all Kuhn said (to Mack, but within Bruce's hearing) was, "You hit the fucking car." Since, viewing the facts most favorably to plaintiff, Bruce hit Mack's car, not vice versa, no reasonable officer in Bruce's position could have relied on Kuhn's statement as a basis for deciding that there was probable cause to believe plaintiff had done anything to warrant either arrest or a search of her vehicle.

Certainly, Bruce could not reasonably have believed that plaintiff was guilty of criminal mischief, which is the crime with which she was eventually charged (albeit not by Bruce). To arrest someone for criminal mischief in the third degree, Bruce would have had to reasonably believe that she backed her car into the police vehicle with the intent to cause damage. *See* N.Y. Penal Law § 145.05 ("A person is guilty of criminal mischief in the third degree when, with intent to damage property of another person, ... he damages property of another person in an amount exceeding two hundred fifty dollars."). Mack claims that it was Bruce, not she, who caused the collision by striking her car from behind. Accepting that scenario, as I must, Bruce had to know—and any reasonable police officer would have known—that plaintiff committed no crime relating to the accident. While it *may* have been reasonable for Bruce to have pointed his weapon at Mack and command her not to move when he originally approached her car, it was not reasonable for him to proceed to search and impound her car, and allow her to be taken to the

station house in handcuffs, because of an incident that, on her version of the facts, was not a crime.

■ To the extent plaintiff's complaint accuses Bruce of malicious prosecution, however, that claim must be dismissed. There is no evidence that Bruce had any involvement with Mack's case after Kuhn drove her away. Thus, he could not be guilty of malicious prosecution, even if that claim properly lay against the other defendants (which it does not—see below). "Typically, a warrantless deprivation of liberty from the moment of arrest to the time of arraignment will find its analog in the tort of false arrest, while the tort of malicious prosecution will implicate post-arraignment deprivations of liberty." *See Raschid v. News Syndicate Co.*, 239 A.D. 289, 267 N.Y.S. 221, 225 (1st Dep't 1933) ("A charge and an arrest do not amount to a prosecution. . . . [Malicious prosecution] lies only when a legal prosecution, a judicial proceeding, has been maliciously, and without probable cause, instituted against the plaintiff, and has been terminated in the plaintiff's favor.") (internal quotations and citation omitted), aff'd, 265 N.Y. 1, 191 N.E. 713 (1934). *See also, Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir.1995).

■ *Chief Coscette:* There are two grounds to hold Chief Coscette in the case. First, a question exists as to whether he personally assisted in the warrantless deprivation of plaintiff's liberty pre-arraignment (thus giving rise to a claim of false arrest against him) by helping Kuhn to trump up felony charges against plaintiff. Plaintiff has offered evidence, in the form of statements by Kuhn, Coscette's alleged co-conspirator, to suggest that Chief Coscette told Kuhn to inflate the amount of damage to the police vehicle so that she could be arrested and prosecuted for felony criminal mischief. She has also come forward with evidence that Coscette pre-

sented a claim to Mack's insurance company for damage to a different police vehicle than the one that was actually involved in the Mack collision, in further support of her false arrest claim. Coscette denies doing anything wrong—in conclusory fashion—but offers no specifics. Even if he had, summary judgment would not lie: on a motion for summary judgment it is the business of the court to determine whether material issues of fact exist, not to resolve those issues.

Chief Coscette would not be entitled to qualified immunity as a matter of law on a view of the facts most favorable to plaintiff. It is beyond dispute that a citizen has the right not to be charged with a crime based on specious facts, and no reasonable police officer could have thought that such behavior was acceptable.

■ Although the facts alleged by plaintiff are heinous, it appears that the malicious prosecution claim must be dismissed as to Chief Coscette. An essential element of a malicious prosecution action under New York State Law is that the underlying criminal action terminated in favor of plaintiff. *See Ward v. Silverberg*, 85 N.Y.2d 993, 629 N.Y.S.2d 168, 652 N.E.2d 914; *Hollender v. Trump Vil. Coop.*, 58 N.Y.2d 420, 461 N.Y.S.2d 765, 448 N.E.2d 432; *Martin v. City of Albany*, 42 N.Y.2d 13, 16, 396 N.Y.S.2d 612, 364 N.E.2d 1304. "A criminal proceeding terminates favorably to the accused, for purposes of a malicious prosecution claim, when the final disposition of the proceeding involves the merits and indicates the accused's innocence." *MacFawn v. Kresler*, 88 N.Y.2d 859, 644 N.Y.S.2d 486, 666 N.E.2d 1359 (1996) (citing *Hollender v. Trump Vil Coop., supra; Halberstadt v. New York Life Ins. Co.*, 194 N.Y. 1, 86 N.E. 801). In this case the information charging plaintiff with criminal mischief in the fourth degree was dismissed by Town

Justice Robert Freehill who concluded that the facts alleged by the People were based on hearsay and therefore not legally sufficient to support the charge. (CPL 170.30[1][a]; 170.35[1][a]). Having dismissed the action on procedural grounds, Justice Freehill never reach the merits of the case, and plaintiff's innocence was not established by the dismissal. Therefore, for the purposes of maintaining an action for malicious prosecution, plaintiff's underlying criminal action cannot be said to have terminated in her favor. *See MacFawn v. Kresler,* 88 N.Y.2d 859, 644 N.Y.S.2d 486, 486–87, 666 N.E.2d 1359 (1996) (information dismissed on procedural grounds, namely that facts alleged by the People were not legally sufficient to support the charge, did not terminate favorably to employee and as such, employee failed to state cause of action for malicious prosecution).

In his capacity as Chief of Police of the Town of Wallkill, Chief Coscette is also a defendant on the *Monell* claim. For the reasons stated below, he is not entitled to summary judgment on that claim, either.

*Town of Wallkill & Chief Coscette:* Finally, there is the question of whether the Town of Wallkill and former Police Chief Coscette are liable to plaintiff because, as a matter of policy and practice, its poorly trained police officers violate the civil rights of citizens. *See, Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611. In her papers opposing the Town's motion, Mack cites to two publicly available documents, the "Consent Decree" and the "First Report of the Monitor" both filed in connection with the *parens patriae* action brought by the New York State Attorney General against the Town of Wallkill. *See People of the State of New York v. Town of Wallkill,* 01 CV 364 (Consent Decree dated February 2001); (First Report of the Monitor dated January 2002). In its memorandum in support of the consent decree, the Attorney General concluded that the police in Wallkill were untrained, unsupervised and out of control, particularly with respect to women. The Town of Wallkill consented to the entry of an injunction premised on that allegation. The monitor appointed by this Court pursuant to the consent decree echoed the Attorney General's findings: "The investigation conducted by the New York Attorney General, confirmed by my own observations, concluded that the Wallkill PD has been under-trained, under-supervised and unprofessional in its policing." (*See* "First Report of the Monitor," at 9). In the "First Report of the Monitor" cited by plaintiff, the Monitor opined that the Attorney General's investigation uncovered convincing evidence that *inter alia:* "The then-police chief [Coscette] of the Wallkill PD and others **responsible for the police force** failed to supervise, monitor and discipline officers who engaged in the alleged misconduct described above." (*See* "First Report of the Monitor," at 10) (emphasis added). Thus, the Monell claim against the Town cannot be dismissed at this juncture.

 If further evidence were needed to raise an issue of fact on the *Monell* point, Bruce's deposition testimony provides an insider's perspective that all was not well with the administration of the Wallkill Police Department at the time of Ms. Mack's arrest. Bruce's rebuke of Coscette and other officers in the department is testament to the lawlessness, non-professionalism and lack of supervision that pervaded the Wallkill Police Department from the top down. In light of the well documented failings of the Wallkill Police Department during the period surrounding Ms. Mack's arrest, the question of whether the actions of Officers Kuhn and Bruce were the result of improper

training or supervision is an open one—one that will ultimately be answered by the jury.

 The *Monell* claim against Coscette personally, however, hinges on whether he, as Chief of the Wallkill Police, was acting as a "policy maker." The identification of policymaking officials is a question of state law. *St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Id.* (Quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)) (plurality opinion). "Thus the identification of policymaking officials is not a question of federal law, and it is not a question of fact in the usual sense. The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms." *Id.* at 124–25, 108 S.Ct. 915.

Unfortunately, I cannot resolve that question of law. No party, certainly not Chief Coscette, has bothered to brief the issue of whether, as a matter of state law, the chief of police is a policymaker for Monell purposes. The matter will have to be resolved—by the Court, if it can be—at the time of trial.

Accordingly, defendants' motions for summary judgment are denied, except as to the claim against Bruce and Coscette for malicious prosecution. The Court will entertain an oral motion to dismiss the malicious prosecution claim from Officer Kuhn at the time of trial. A final pre-trial conference in this matter will be held March 21, 2003 at 9:00AM. Jury selection and trial will commence on March 24, 2003 at 9:00A.M.

This constitutes the decision and order of the Court.