**John KAYLOR, Plaintiff**

v.

**Brian RANKIN, et al., Defendants**

**No. 3:03CV7612.**

United States District Court,
N.D. Ohio,
Western Division.

March 4, 2005.

John R. Kuhl, Rhonda G. Hall, John R. Kuhl & Associates, Thomas A. Sobecki, Toledo, Wesley M. Miller, Jr., Kingman, AZ, for John Kaylor, Plaintiff.

Larry P. Meyer, Manahan, Pietrykowski, DeLaney & Wasielewski, Arthur C. Ingram, Mollenkamp & Ingram, Keith A. Wilkowski, Vassar, Dills & Dawson, Toledo, Martin Aubrey, Perrysburg, Paul R. Bonfiglio, Vassar, Dills & Dawson, Toledo, for Brian J. Radde, in his individual and official capacity with Clay Township Police Department, Roger Schultze, in his individual and official capacity as Chief of Police, Clay Township Police Department, Township of Clay, Brian Rankin, in his individual and official capacity with Elmore Police Department, George Hayes, in his individual and official capacity as Chief of Police, Elmore Police Department, Village of Elmore, Defendants.

Robert J. Bahret, Bahret & Associates, Holland, for Auto–Owners Insurance Company, Intervenor.

## ORDER

CARR, Chief Judge.

This is a civil rights case under 42 U.S.C. § 1983 in which plaintiff John Kaylor alleges that the defendants, police officers Brian Rankin of the Elmore, Ohio, Village Police Department and Brian Raddle of the Clay Township Police Department arrested him without probable cause, and, while doing so, injured him through the use of excessive force. Officer Rankin filed a counterclaim, which has been amended, in which he alleges assault, negligent infliction of personal injuries and emotional distress, and loss of consortium.

Pending are the defendants' motions for summary judgment. For the following reasons, both motions shall be granted in part and denied in part.

### Background

During the afternoon of April 13, 2003, Kaylor was moving kitchen cabinets out of an apartment and into the basement of his home on Fremont Street in Elmore, Ohio. A friend, Glen Humberger, was helping Kaylor. Humberger had pulled his truck into the alley behind Kaylor's home. Kaylor, Humberger, and Kaylor's girlfriend, Diane Sterling, unloaded the truck.

While on patrol, Officer Rankin noticed Humberger's truck blocking the alleyway behind Fremont Street. After waiting two minutes for someone to move the vehicle, Rankin began issuing a citation for obstruction of a public roadway.

Sterling saw Rankin issuing the ticket. She told Kaylor that a police officer was stopped in front of Humberger's truck.

Shortly thereafter, Humberger moved his truck and informed Kaylor that Rankin was issuing him a parking citation.

While Officer Rankin was in his cruiser completing the citation, Kaylor approached the police vehicle. A verbal confrontation ensued.

The parties differ as to the facts of the confrontation. Kaylor asserts that he approached the vehicle and said to Officer Rankin, in a conversational, laughing manner: "You've got to be kidding me. We're unloading stuff in the garage. Come over here and look." (Doc. 73 at 3.) He says Officer Rankin did not acknowledge him. Kaylor then stated: "Sir, you have no common sense whatsoever, and this is bullshit." (*Id.*) At that point, Kaylor walked away and returned to his garage.[1]

After calling for assistance, Rankin waited outside his cruiser for another officer to arrive. He activated a video camera in his vehicle and microphone in his pocket. Humberger approached Rankin, who having earlier given him the wrong portion of the ticket, gave Humberger the correct portion of the ticket.

In the meantime, Kaylor had gone into and come back out of his residence. Standing in his garage, Kaylor harangued Rankin. He called Officer Rankin a "f--king asshole,"told him that "if he couldn't take the heat, he should get out of the kitchen," and made a comment about the Constitution and his right to bear arms. (Doc. 73 at 5.). Asked repeatedly by Rankin to produce identification, Kaylor refused to do so. Kaylor was in the garage throughout this portion of the encounter, and remained there until arrested.

Officer Radde arrived after a few minutes. The following conversation took place between Officer Rankin and Officer Radde after Officer Radde's arrival.

Rankin: I was writin' a parking ticket . . .

Radde: Okay.

Rankin: . . . to this gentleman in the hat . . .

Radde: Okay.

Rankin: on this vehicle,

Radde: Okay.

Rankin: And this gentleman who lives here come out, told me I was an asshole,[says that] he wants to go to jail, so I think I'd like to oblige him. He won't give me his ID, won't give me anything.

(Doc. 48;Doc. 73 at 9).

After this brief conversation, Rankin and Radde approached the garage and asked Kaylor for identification. When Kaylor refused to produce identification, Radde told him to turn around and place his hands behind his back.

Kaylor refused and attempted to pull away from the officers when they placed their hands on him. A scuffle broke out as the two officers sought to restrain Kaylor. During the scuffle, Kaylor became physically violent and continued his verbal attacks against the officers. Radde eventually used pepper spray to subdue Kaylor.

Kaylor was arrested and placed in Radde's cruiser. He was later charged with

---

1. Officer Rankin's recollection of the confrontation differs. He contends that Kaylor approached him and stated: "You got to be kidding me." (Doc. 58 at 3.) Officer Rankin responded with "Excuse me?" Kaylor then repeated, "You got to be kidding me." Officer Rankin asked Kaylor, "Is this your vehicle?" "No," Kaylor responded. Officer Rankin said, "This don't have anything to do with you. You can leave." (*Id.*)

Kaylor then allegedly called Officer Rankin an "asshole, a mother f--king asshole," while pointing his finger at Officer Rankin. (*Id.*) Officer Rankin asked Kaylor, "Do you want to go to jail?" (Doc. 58 at 4.) "Yes, I do," responded Kaylor. (*Id.*) Officer Rankin radioed for backup, and Kaylor walked away. Kaylor denies calling Officer Rankin an "asshole," pointing his finger at Officer Rankin, and stating that he wanted to be arrested.

obstructing official business and other crimes related to the altercation. All charges were later dismissed.

On October 20, 2003, Kaylor filed this action against officers Rankin and Radde, their police chiefs, the Township of Clay, and the Village of Elmore.

Officer Rankin timely filed a counterclaim for assault, negligent infliction of emotional distress, and loss of consortium against Kaylor. After the altercation, he complained that his knee was "blown." An ambulance was called and took Rankin for medical treatment.

## Discussion

Officers Rankin and Radde seek summary judgment on the basis that they are entitled to qualified immunity under both federal and state law.

### A. Qualified Immunity: Federal Law

Qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Rankin and Radde contend they are entitled to qualified immunity because they violated no clearly established constitutional right of which they were or reasonably should have been aware.

The Supreme Court held in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), that resolution of claims of qualified immunity involves two steps. First I must determine whether the facts alleged suffice to show a constitutional violation. *See Greene v. Barber,* 310 F.3d 889, 894 (6th Cir.2002) (citing *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). If, viewing the facts most favorably for the plaintiff, he can prove no violation of any of his constitutional rights, no further inquiry concerning qualified immunity is required. *Id.*

If a jury could find that the plaintiff's constitutional rights were violated, the next step is to determine whether the right was clearly established. *Id.* In making this determination, " '[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Id.* (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151). If so—if the constitutional right was clearly established, the defendant cannot maintain the defense of qualified immunity.

#### i. Unlawful Arrest

Plaintiff claims that he was arrested without probable cause. If so, the arrest violated the plaintiff's Fourth Amendment rights. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Sandul v. Larion,* 119 F.3d 1250, 1256 (6th Cir. 1997) (a "police officer is permitted to make an arrest if there is probable cause to believe that the arrestee has committed or is committing an offense.").[2]

2. The defendants argue that, prior to the onset of the scuffle, they intended simply to ascertain Kaylor's identity and otherwise investigate the circumstances. I note that the record reflects a request for identification after the defendants approached Kaylor in his garage. When Kaylor refused to identify himself, Radde told him to turn around and put his hands behind his back (which might be viewed as a preliminary to an arrest). When Kaylor did not do so, Radde placed his hand

on Kaylor's arm. This conduct is, or at least could reasonably be viewed by a jury as consistent with an intent to arrest, rather than merely to detain for further inquiry.

The jury could find that an arrest, rather than investigatory detention occurred, despite the lack of formal indicia of arrest. *See, e.g., Hayes v. Florida,* 470 U.S. 811, 815–16, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) ("at some point in the investigative process, police procedures can qualitatively and quantitatively

■ Whether there is probable cause for an arrest depends on whether there are sufficient "facts and circumstances within the officer's knowledge" to warrant a prudent officer to believe that the suspect had committed or was about to commit an offense. *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *Beck,* 379 U.S. at 90, 85 S.Ct. 223. The officer's actions are measured by what a reasonable officer would have done under the same circumstances. *Sandul,* 119 F.3d at 1256. If a reasonable officer under the same circumstances would have believed that the arrest was lawful, then the arresting officer is entitled to qualified immunity. *Id.*

Because Officers Rankin and Radde arrived on the scene at different times and had different circumstances surrounding their actions, I examine their claims for qualified immunity separately.

### a. Officer Rankin

### I. Fourth Amendment Violation

Officer Rankin contends that Kaylor was not the subject of an illegal arrest because he obstructed official business, ignored warnings to desist, and refused to disclose his identity.

In Ohio, the elements of the offense of obstructing official business are:

(1) No person, without privilege to do so; (2) with purpose to prevent, obstruct or delay the performance by a public official of any authorized act within his official capacity; (3) shall do an act which hampers or impedes a public official in the performance of his lawful duties.

O.R.C. § 2921.31.[3]

■ A jury could find that, after the initial verbal exchange, Kaylor obeyed Rankin's instruction to leave. A jury could also find that nothing Kaylor did obstructed official business, impaired his ability to issue the citation to Humberger, or otherwise impeded issuance of the ticket.

■ The question thus becomes whether Kaylor's subsequent conduct—which, until the start of the officers' efforts to arrest him, consisted entirely of taunts, insults, and epithets—gave the officers probable cause to arrest him.[4] Interpret-

be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments."); *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 590 (6th Cir. 1994) ("The Fourth Amendment's protections are not limited to 'traditional' arrests."); *United States v. Canales,* 572 F.2d 1182, 1187 (6th Cir.1978) ("[a] clear deprivation of liberty caused by law enforcement officers without formal words is nonetheless an arrest."). The Supreme Court has held that the line between an investigatory detention and an arrest is crossed "when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." *Hayes,* 470 U.S. at 816, 105 S.Ct. 1643.

**3.** The record does not indicate whether Kaylor was arrested under the state statute or a municipal ordinance. In any event, the ele-

ments of any ordinance under which Kaylor may have been charged would, in all likelihood, have been substantially similar to the state provision. *See City of Parma v. Campbell,* 2001 WL 1352657, *4–5 (Ohio Ct.App. Nov. 1, 2001).

**4.** Absent some other basis for interfering with Kaylor's freedom of movement, his refusal to produce identification is not sufficient for a finding of probable cause. *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (The Supreme Court has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (A person approached by a police officer "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way."); *see also Jacobs v. Village of Ottawa Hills,* 111

ing a municipal ordinance with elements similar to O.R.C. § 2921.31, an Ohio appellate court reversed a conviction for obstructing official business where the defendant had made "boisterous statements to police telling them to leave his house; suggest[ed] he would file a lawsuit against the city for the officers' presence in his house; and refus[ed] to bring [another individual] to the police station." *City of Parma v. Campbell,* 2001 WL 1352657, *4–5 (Ohio Ct.App. Nov. 1, 2001). The court stated:

> Our review of the case law, therefore, indicates that courts have affirmed convictions for obstruction of official business only when the manner and context of the boisterous statement prevented a public official from carrying out his or her lawful duty.

> Here, ... [the record] shows that [the defendant] told Officer O'Grady that he would not bring Heather to the police station and that he would file a lawsuit against the police for their presence in his home.... We further note that Officer O'Grady could have terminated the phone call by hanging up to avoid having the obscenities allegedly hurled at him. Thus, based on our review of the record and the case law, we have concluded that although the statements made to Officer O'Grady may have evidenced uncooperative conduct, such conduct in this case does not rise to the level of an act hampering performance of official police duties.

*Id.* at 5. *Accord, State v. Smith,* 108 Ohio App.3d 663, 669, 671 N.E.2d 594 (1996) (reversing defendant's conviction for obstruction of official business under O.R.C. § 2921.31 where the defendant had been prosecuted "solely for his boisterous statements" to the arresting officer).

F.Supp.2d 904, 911 (N.D.Ohio 2000), *aff'd in part, rev'd in part on other grounds,* 5 Fed. Appx. 390, 2001 WL 224063 (6th Cir. Feb.26, 2001) (collecting cases on "the fundamental

In any event, the First Amendment gives considerable latitude to citizens to express their views about the police and their activities.

Thus, in *City of Houston v. Hill* 482 U.S. 451, 455, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), the Supreme Court invalidated an ordinance that prohibited interruption of a police officer in the performance of his or her duty. Officers had arrested the plaintiff for shouting at them in an attempt to divert their attention away from his friend to whom the officers were speaking. *Id.* at 453–54, 107 S.Ct. 2502. Holding that the First Amendment protected the defendant's conduct, the Court stated that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63, 107 S.Ct. 2502.

In *Lewis v. City of New Orleans,* 415 U.S. 130, 131–32, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), the Supreme Court vacated the defendant's conviction for violating an ordinance which, *inter alia,* prohibited cursing a police officer in the performance of his duty. *See also Gooding v. Wilson,* 405 U.S. 518, 525, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (holding that Georgia breach-of-peace statute, which was not limited to fighting words, was facially invalid; after being asked not to block a door, plaintiff had said, "White son of a bitch, I'll kill you. You son of a bitch, I'll choke you to death. You son of a bitch, if you ever put your hands on me again, I'll cut you all to pieces.").

The Sixth Circuit held in *Sandul, supra,* that a police officer lacked probable cause

right of every citizen, when approached by a police officer who lacks reasonable suspicion of criminal activity, to refuse to answer the officer's questions and walk away").

to make an arrest where an arrestee shouted "f— k you" to a group of abortion protestors. 119 F.3d at 1256. The Court also held that the officer was not entitled to qualified immunity because an arrestee's right to engage in such speech was clearly established and a reasonable officer should have known that speech was protected. *Id.* at 1254–56.[5]

■ Not all verbal assaults are protected: "fighting words," or words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace" do not enjoy First Amendment protection. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). When addressed to a police officer, however, words that might be "fighting words" and thus outside the First Amendment if spoken to a private citizen, enjoy First Amendment protection. *See Lewis*, 415 U.S. at 135, 94 S.Ct. 970 (Powell, J., concurring) ("a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'") (citation omitted); *see also Greene*, 310 F.3d at 896 (noting that arrestee's "use of the word 'asshole' could not reasonably have prompted a violent response from the arresting officers" and "it is hard to imagine [arrestee's] words inciting a breach of the peace by a police officer whose sworn duty it was to uphold the law").

■ In this case, Kaylor's tirade did not, as a matter of law, rise to the level of fighting words. *See, e.g., Greene*, 310 F.3d at 896 (finding that arrestee's characterization of an officer as an "asshole" protected by the First Amendment); *Sandul*, 119

F.3d at 1255 (same; arrestee shouted "f— k you" to abortion protestors). This is especially so in view of the consideration that his verbal broadside was aimed solely at Officers Rankin and Radde.

Kaylor's statements, crude and rude as they were, remained protected by the First Amendment, and their utterance could not lead to his arrest for obstructing official business.

■ I conclude that the facts known to and observed by Officer Rankin would not have caused a reasonable officer, who was familiar with what an officer should know about the law, to have concluded that the plaintiff had engaged, or was about to engage in a crime.

Before he approached Kaylor and sought to arrest him, Officer Rankin had issued the ticket to Humberger, thereby completing his official business. Rather than leaving, Rankin chose to wait for the arrival of Officer Radde.

While standing in his garage, Kaylor posed no immediate threat to the officers, despite the vulgarity of what he was saying. There was, accordingly, no probable cause to arrest the plaintiff.

Alternatively, even if Officer Rankin had had probable cause to arrest Kaylor, a constitutional question still exists about the lawfulness of the arrest under the circumstances of this case. Were a jury to find that Kaylor was arrested in retaliation for having engaged in constitutionally protected speech, the arrest would not have been lawful, despite the presence of probable cause.

■ It is well established that " '[a]n act taken in retaliation for the exercise of a

---

5. Ohio courts likewise acknowledge the First Amendment right to express one's views, even in obscene terms, without risking arrest for obstruction of official business. *See Campbell, supra*, 2001 WL 1352657, *5; *City of*

*Warren v. Lucas*, 2000 WL 655446, *3(Ohio Ct.App. May 19, 2000) (holding "comments that were highly critical of police and fire officials, ... are protected by the First Amendment");

constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.'" *Greene,* 310 F.3d at 895 (quoting *Bloch v. Ribar,* 156 F.3d 673, 681–82 (6th Cir.1998)). "[G]overnment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity.'" *Id.* (quoting *Bloch,* 156 F.3d at 682).

▇ Thus, even if Officer Rankin had probable cause to believe that Kaylor was obstructing official business, the existence of probable cause would not justify the arrest if Officer Rankin's intended to punish an insult to his dignity. Taken in the light most favorable to Kaylor, the record before me could lead a rational jury to find that the arrest resulted from an improper motive.

On alternative grounds a trier of fact could conclude that Kaylor's arrest violated his rights under the Fourth Amendment.

### ii. No Qualified Immunity

Under the second branch of the *Saucier* analysis, I must determine whether Kaylor's right not to be arrested absent probable cause, and, in the alternative, for insulting a police officer, was clearly established in April, 2003.

Few, if any propositions are as clearly established in the law as the requirement of probable cause to arrest. *See, e.g., Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (officers "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue"); *Dietrich v. Burrows,* 167 F.3d 1007, 1012 (6th Cir.1999) ("the law [is] clearly established that, absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may

not arrest an individual."). Officer Rankin is, accordingly, not immune from suit for the consequences of having arrested the plaintiff without probable cause.

I likewise conclude that a reasonable officer would have understood that he could not arrest a citizen merely on the basis of verbal abuse and insult. *Greene,* 310 F.3d at 897 (holding that the officer "should have known that an arrest undertaken at least in part as retaliation for a constitutionally protected insult to the officer's dignity would be impermissible unless it could be shown that the officer would have made the arrest even in the absence of any retaliatory motive"); *McCurdy v. Montgomery County, Ohio,* 240 F.3d 512 (6th Cir.2001) (reversing district court's grant of qualified immunity to officer based on the lower court's misunderstanding that "it was not clearly established that the First Amendment prohibited an officer from effectuating an otherwise valid arrest if that officer was motivated by a desire to retaliate against the arrestee's assertion of First Amendment rights.").

As a general rule, accordingly, an officer who arrests someone without probable cause is not immune from suit.

### b. Officer Radde

### 1. Fourth Amendment Violation

▇ Officer Radde contends that he is protected by qualified immunity because he was "reasonably justified in believing that plaintiff was under arrest." (Doc. 46 at 12.) A rational jury could find that this was not so, and that Radde, in light of what he learned from Officer Rankin, neither understood that Kaylor had been arrested nor that probable cause existed to arrest him.

As previously noted, the following conversation occurred after Radde arrived:

Rankin: I was writin' a parking ticket
...
Radde: Okay.
Rankin: ... to this gentleman in the hat
...
Radde: Okay.
Rankin: on this vehicle,
Radde: Okay.
Rankin: And this gentleman who lives here come out, told me I was an asshole, [says that] *he wants to go to jail, so I think I'd like to oblige him. He won't give me his ID, won't give me anything.* (Doc. 48; Doc. 73 at 9) (emphasis supplied).

As this conversation was occurring, Kaylor was in his garage. Rankin did not tell Radde that he had arrested Kaylor or that an arrest was in progress.[6] Rankin did not tell Radde anything about Kaylor's actions other than that what he had said.

"Obliging" an individual who says he "wants to go to jail" does not give rise to probable cause to arrest him. *Cf. Evans v. Meyers,* 1990 WL 43395 (N.D.Ill. Mar.29, 1990) (where grounds otherwise did not exist to arrest the plaintiff, the fact that she said, "arrest me" prior to arrest did not alter court's finding of no probable cause).

There is no basis in the record currently before the court for concluding that Radde had reason to believe that the plaintiff had committed, was committing, or was about to commit a crime. Consequently, his participation in the effort to arrest the plaintiff violated the Fourth Amendment.

■■■■ There is, as well, another basis on which a jury could find that Radde violated the plaintiff's Fourth Amendment rights. Law enforcement officials have a duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers. *Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir.1982). An officer who fails to intervene:

> is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official.

*Jacobs, supra,* 5 Fed.Appx. at 394–95 (quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) (citations omitted)); *see also Mack v. Town of Wallkill,* 253 F.Supp.2d 552, 559 (S.D.N.Y.2003) (collecting cases).

■■■■ To be liable, an officer must have had "a realistic opportunity to intervene to prevent the harm from occurring." *Anderson,* 17 F.3d at 557. Generally the issue of whether an officer had sufficient time to intervene or was capable of preventing the harm is a question of fact for the jury unless, based on all the evidence, a reasonable jury could not possibly conclude otherwise. *Id.*

A jury could reasonably find that Officer Radde had sufficient time to intervene and was able to avoid the unlawful arrest of Kaylor. Kaylor was some distance from the officers, standing in his garage. No one was being threatened, or appeared to be in any danger. No exigency kept Radde from inquiring further about the circumstances, or suggesting that some other course be followed.

---

6. This factor distinguishes this case from *Jacobs, supra,* 5 Fed.Appx. 390, 394–95(6th Cir. 2001), in which an officer who arrived on the scene as another officer was attempting to restrain the plaintiff physically had no basis for knowing that such restraint was without lawful cause. In this case, in contrast, Radde had no basis for believing that any cause existed to arrest Kaylor.

■ I conclude that Radde's involvement in the arrest violated Kaylor's Fourth Amendment rights in that he acted without probable cause, knew or should reasonably have known that both he and Rankin were acting without probable cause, and should have intervened to stop the unlawful arrest from happening.

### iii. No Qualified Immunity

Whether an officer acted lawfully when he arrested a citizen—in other words, whether, in this case, Radde reasonably believed that there was probable cause to arrest Kaylor—depends on the officer's subjective understanding of the circumstances. *E.g., Klein v. Long,* 275 F.3d 544, 549–50 (6th Cir.2001). This is so, even if the officer was mistaken about some of the facts on which he relied. *Id.* Even in such circumstances, the officer will be entitled to qualified immunity where, evaluated from the perspective of a reasonable, competent officer, such "reasonable officer could have believed" that his conduct was lawful "in light of clearly established law and the information the ... officer[ ] possessed." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ This is not a case, however, in which an officer was mistaken about the facts. It is, rather, a case in which the facts of which he was aware did not justify a reasonable belief that arresting Kaylor would be lawful. He had no more reason than Rankin to believe that probable cause existed; I conclude, accordingly, that Officer Radde is not entitled to qualified immunity.

Likewise, with regard to Radde's failure to intervene to prevent the unlawful arrest, I conclude that his duty to do so, in light of what he knew and did not know, was clearly established. *See, e.g., Bruner, supra.*

### 2. Unreasonable Use of Force

Whether Officers Rankin and Radde violated Kaylor's right to be free from excessive force is a question that must be analyzed under an "objective reasonableness" standard. *Greene,* 310 F.3d at 898 (6th Cir.2002) (citing *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). This standard requires me to consider: "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

■ Whether the force used to subdue Kaylor was reasonable must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (citing *Terry v. Ohio,* 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). This inquiry must also keep in mind the fact "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397, 109 S.Ct. 1865.

■ Kaylor's supposed crime, obstruction of official business, was not severe, and had not involved physical acts on his part. He was not threatening anyone's safety or attempting to flee. Once the officers undertook to arrest him, however, he actively resisted arrest, did so in an aggressive and physical manner, and continued to do so until finally subdued.

During the scuffle, Officer Radde used pepper spray to subdue Kaylor. Although the Sixth Circuit recognizes circumstances in which the use of pepper spray by police

officers will not be considered to be excessive force, those cases are, so far, limited to situations where either the defendant is armed or the officers fear for the arrestee's own safety.[7] Kaylor was unarmed and presented no danger to himself. Therefore, under these circumstances, the use of pepper spray may have constituted excessive force in violation of the Fourth Amendment.[8]

Under the *Saucier* analysis, however, I cannot find that it would have been clear to a reasonable officer in Officer Radde's position that it would be unlawful for him to use pepper spray on an arrestee who was actively and aggressively resisting arrest. *See Greene,* 310 F.3d at 899. Because I cannot find that the right to be free from the level of force used here was clearly established, Officers Rankin and Radde are entitled to qualified immunity on plaintiff's unreasonable use of force claim.

### 3. Conspiracy

Section 1985(3) prohibits a conspiracy "for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws." 42 U.S.C. § 1985. To prevail on a § 1985(3) claim, an individual must prove:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 314 (6th Cir.2005) (quoting *United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)).

Section 1985(3) also requires that the conspirators were motivated by a "racial" or "class-based, invidiously discriminatory animus." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) ("The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.)

Though neither party addressed plaintiff's conspiracy claim directly, it ap-

---

**7.** *See, e.g., Gaddis ex rel. Gaddis v. Redford Tp.* 364 F.3d 763, 774 (6th Cir.2004) (use of pepper spray was not excessive force where suspect was armed with a knife and refused to submit to arrest; noting "One of the main purposes of nonlethal, temporarily incapacitating devices such as pepper spray is to give police effective options short of lethal force that can be used to take custody of an armed suspect who refuses to be lawfully arrested or detained."); *Ewolski v. City of Brunswick,* 287 F.3d 492, 508 (6th Cir.2002) (expressing doubt "that the use of non-lethal force against an armed and volatile suspect constitutes excessive force"); *Monday v. Oullette,* 118 F.3d 1099, 1104–05 (6th Cir.1997) (upheld police

officer's use of pepper spray to subdue an unarmed individual the police feared would injure himself or commit suicide by overdosing on pills if not taken into custody).

**8.** *See, e.g., Greene,* 310 F.3d at 899 (holding that "a reasonable officer in [the defendant's] position would not necessarily have known that it might be unlawful for him to use pepper spray on a plaintiff who was actively resisting arrest)"; *Adams v. Metiva,* 31 F.3d 375, 384–87 (6th Cir.1994) (police used excessive force by repeatedly spraying mace in the face of an unarmed plaintiff who was not resisting and was not subject to lawful arrest).

pears that his claim must fail. In his complaint and brief in opposition to summary judgment, Kaylor alleged no facts and produced no evidence sufficient to establish any racial or class-based discriminatory animus behind the officers' actions. *See Bass v. Robinson,* 167 F.3d 1041, 1051 (upholding dismissal of plaintiff's conspiracy claim where plaintiff failed to show that police officers' use of excessive force was motivated by any invidious class-based animus). Because the record is devoid of any evidence that defendants' unlawful arrest of plaintiff was motivated by racial or other class-based animus, defendants are entitled to summary judgment on plaintiff's conspiracy claim.

### B. State Law Immunity

Kaylor asserts five state law claims against defendants: assault, battery, false arrest, intentional/reckless infliction of emotional distress, and negligence. In their motions for summary judgment, defendants argue they are entitled to immunity under Ohio Rev.Code § 2744.03, which provides immunity to governmental employees unless: "The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(6)(b).

 In *Caruso v. State,* 136 Ohio App.3d 616, 620–21, 737 N.E.2d 563 (2000), the Ohio Supreme Court summarized the terms used in the immunity statute:

> Malicious purpose encompasses exercising "malice," which can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified.

> Bad faith has been defined as the opposite of good faith, generally implying or involving actual or constructive fraud or a design to mislead or deceive another. Bad faith is not prompted by an honest

mistake as to one's rights or duties, but by some interested or sinister motive.

> Finally, reckless conduct refers to an act done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent. The term "reckless" is often used interchangeably with the word "wanton" and has also been held to be a perverse disregard of a known risk. As to all of the above terms, their definitions connote a mental state of greater culpability than simple carelessness or negligence.

Malice may be inferred from proof of lack of probable cause. *Melanowski v. Judy,* 102 Ohio St. 153, 155, 131 N.E. 360 (1921).

Where there are genuine issues of material fact as to whether police officers acted with malicious purpose, in bad faith, or in a wanton or reckless manner, I cannot extend qualified immunity under O.R.C. § 2744.03 where the plaintiff asserts state claims for false arrest and assault. *Jacobs v. Village of Ottawa Hills,* 159 F.Supp.2d 693, 699 (N.D.Ohio 2001).

### 1. Assault

An assault is "the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." *Smith v. John Deere Co.,* 83 Ohio App.3d 398, 406, 614 N.E.2d 1148 (1993). An assault is the beginning of an act which, if consummated, would constitute battery. The act must also be such as to cause reasonable fear of immediate physical violence. *Matlock v. Ohio Dept. of Liquor Control,* 77 Ohio Misc.2d 13, 665 N.E.2d 771 (Ohio Ct.Cl.1996) (citing *Ryan v. Conover,* 59 Ohio App. 361, 18 N.E.2d 277 (1938)).

■ Defendants contend that they cannot be held liable for having committed an assault where they used reasonable force to detain a suspect. That contention presupposes that they were acting lawfully when they sought to keep the plaintiff from walking away. That presupposition is incorrect, because Officers Rankin and Radde were acting without lawful justification. Accordingly, they had no right to undertake to touch the plaintiff. They can thus be deemed to have committed an assault on him. *Cf. Love v. City of Port Clinton,* 37 Ohio St.3d 98, 99, 524 N.E.2d 166 (1988) (officer who subdued and handcuffed the plaintiff committed intentional acts which, unless privileged, constituted a battery).

In this case, there is evidence in the record from which a jury could find that Officer Rankin was acting to gratify personal resentment against Kaylor based on Kaylor's heckling and name calling, and thus acting maliciously. I accordingly conclude that Officer Rankin is not entitled to summary judgment on the basis of immunity as to plaintiff's assault claim.

■ As to Officer Radde, there is sufficient evidence in the record from which a jury to conclude that he acted recklessly or maliciously in assisting Officer Rankin in an unlawful arrest. Officer Radde had reason to know that probable cause did not exist to arrest Kaylor and that Officer Rankin was or may have been acting out of personal resentment toward Kaylor. Such knowledge may lead a reasonable person to believe that his conduct in unlawfully arresting Kaylor created an unnecessary risk of physical harm. Moreover, following the arrest, Officer Radde declared: "I should have shot him." (Doc. 48). Given such evidence of animus, I cannot find that Officer Radde is not entitled to summary judgment on the basis of immunity as to plaintiff's assault claim.

## 2. Battery

A person is subject to liability for battery when he or she "acts intending to cause a harmful or offensive contact, and when a harmful contact results." *Love,* 37 Ohio St.3d at 99, 524 N.E.2d 166. Offensive contact is "contact which is offensive to a reasonable sense of personal dignity." *Id.*

Generally, in effecting an arrest, a police officer usually, if not necessarily commits acts which, unless privileged, constitute battery. *Id.* (citing Restatement (Second) of Torts § 118, cmt. b (1965) ("An arrest, whether with or without a warrant, usually involves conduct which, unless privileged, is an assault or battery.")). In *Love,* the Ohio Supreme Court stated: "The acts of subduing and handcuffing are undoubtedly offensive to a reasonable sense of personal dignity. The contact involved is plainly intentional; one cannot accidentally handcuff or subdue another."

For the reasons I articulated above regarding plaintiff's assault claim, Officers Rankin and Radde are not entitled to summary judgment on the basis of immunity as to plaintiff's claim of battery.

## 3. False Arrest

■ In Ohio, the elements of false imprisonment and false arrest are the same; the only difference being that false arrest involves a law enforcement officer, while false imprisonment involves a private citizen. *Rogers v. Barbera,* 170 Ohio St. 241, 243, 164 N.E.2d 162 (1960) ("[F]alse arrest and false imprisonment as causes of action are indistinguishable. The only distinction lies in the manner in which they arise.").

False imprisonment/false arrest is "to confine one intentionally without lawful privilege and against his consent within a limited area for any appreciable time, however short." *Feliciano v. Kreiger,* 50 Ohio St.2d 69, 71, 362 N.E.2d 646 (1977); *see*

also *Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir.2003) (quoting *Faulkner v. Faulkner*, 2000 WL 5910, *1 (Ohio Ct.App., Jan 7, 2000)) ("The requisite elements for false arrest are (1) a detention of the person, and (2) an unlawful detention.").

██ Malice is not an element of, and good faith is not a defense to, a claim of a false imprisonment/arrest. *Brinkman v. Drolesbaugh*, 97 Ohio St. 171, 119 N.E. 451 (1918)(Syllabus)("False imprisonment per se is not concerned with good or bad faith, malicious motive or want of probable cause on the part of the prosecuting witness, or the officer causing the imprisonment.").

██ Officer Rankin lacked probable cause to arrest the plaintiff. Applying the standard set forth in *Caruso*, a jury could concluded that the decision to arrest plaintiff as he was exercising his constitutional right to oppose the police verbally was undertaken to gratify personal resentment on the part of Officer Rankin. Furthermore, there is sufficient evidence in the record from which a jury could conclude that Officer Radde acted recklessly in assisting Officer Rankin with an arrest that Officer Radde had reason to know was unlawful. Accordingly, the officers' motions for summary judgment shall be denied with respect to plaintiff's false arrest claim.

#### 4. Intentional/Reckless Infliction of Emotional Distress

Under Ohio law, a claim for intentional infliction of emotional distress requires proof of:

(1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Burkes v. Stidham*, 107 Ohio App.3d 363, 375, 668 N.E.2d 982 (1995).

██ Serious emotional distress requires an emotional injury which is both severe and debilitating. *Id.* (citing *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983)).

The Supreme Court of Ohio, in *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374–375, 453 N.E.2d 666 (1983), described what constitutes extreme and outrageous conduct:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.... Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ... The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

██ Based on the evidence before me, and the limited basis on which defendants seek summary judgment on plaintiff's claim for intentional infliction of emotional distress, I must deny defendants' motions. A reasonable jury could conclude that Officers Rankin and Radde acted with malice, bad faith, and/or recklessness in arresting plaintiff.

### 5. Negligence

The Ohio immunity statute does not exclude negligence from its scope. The defendants are, accordingly, entitled to immunity from suit with regard to plaintiff's claims that they acted negligently. *See, e.g., Gulett v. Haines,* 229 F.Supp.2d 806, 819 (S.D.Ohio 2002) (Corrections officer was immune from pretrial detainee's claim of negligence arising out of alleged beating by county jail inmate.).

The same is true with regard to any claim of gross negligence on the defendants' part. For purposes of immunity, Ohio courts equate negligence and gross negligence. *Chalker v. Howland Twp. Trustees,* 74 Ohio Misc.2d 5, 20, 658 N.E.2d 335 (Ct.Com.Pl.1995) ("Negligence, or even gross negligence, does not necessarily involve or require proof" that the defendant acted " 'with a malicious purpose, in bad faith, or in a wanton or reckless manner' " as provided in O.R.C. § 2744.03(A)(6)).

The defendants' motion to dismiss plaintiff's claims of negligence shall, accordingly, be granted on the basis of their official immunity under O.R.C. § 2744.03(A)(6).

### Conclusion

In light of the foregoing, it is

ORDERED THAT defendants' motions for summary judgment be, and the same hereby are, denied, except with regard to plaintiff's § 1983 Fourth Amendment claim for unreasonable use of force, § 1985 conspiracy claim, and plaintiff's state-law negligence claim, as to which the motions are granted.

So ordered.