**BURKES et al., Appellants,**

v.

**STIDHAM et al., Appellees.**

[Cite as *Burkes v. Stidham* (1995), 107 Ohio App.3d 363.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 68560.

Decided Nov. 13, 1995.

*Harold Pollock Co., L.P.A., Harold Pollock* and *Blake Dickson,* for appellants.

*Walter & Haverfield* and *Carl E. Anderson,* for appellee Ronald B. Adrine.

*Ronald Adrine,* for appellees R.J. Stidham et al.

SPELLACY, Presiding Judge.

Plaintiffs-appellants Caesar D. Burkes and C.B. Management Company, Inc. ("appellants") appeal the grant of summary judgment in favor of defendants-appellees R.J. Stidham and Ronald B. Adrine. Appellants' complaint stated claims for defamation and intentional infliction of emotional distress.

Appellants assign the following errors for review:

"I. The trial court erred in granting appellee Adrine's motion for summary judgment when the record was replete with numerous genuine issues of material fact.

"II. The trial court erred in granting appellee Adrine's motion for summary judgment because appellee Adrine failed to establish the defense of qualified privilege.

"III. The trial court erred in granting appellee Adrine's motion for summary judgment because it was alleged that appellee acted with actual malice, and the determination of whether appellee Adrine's statements were published with actual malice was a jury issue.

"IV. Appellee Adrine was not entitled to summary judgment on appellant Burkes' claim for intentional infliction of emotional distress because a material issue of fact exists as to whether appellees' conduct was so outrageous as to justify a claim for intentional infliction of emotional distress.

"V. The trial court erred in granting appellee Adrine's motion for summary judgment because appellants produced evidence of falsehood sufficient to meet the standards set out in *Wing v. Anchor Media, Ltd. of Texas.*

"VI. The trial court erred in granting summary judgment in favor of appellee Stidham because appellee Stidham never filed a motion for summary judgment with the trial court, but merely requested leave to do so, and to adopt as his own the arguments of appellee Adrine via a 'short form' proposed motion for summary judgment attached to his request for leave, and the court granted such leave on December 28, 1994, and proceeded to treat appellee Stidham's proposed motion as a filed motion without the motion ever having been filed, and without affording appellants the opportunity to file a response brief to such motion within thirty (30) days as permitted by Local Rule 56."

Finding the assignments of error to lack merit, the judgment of the trial court is affirmed.

## I

This case had its genesis in the proposed sale of two Cleveland radio stations, WJMO–AM and WJMO–FM, to Zebra Broadcasting Corporation ("Zebra").

Zebra was formed in order to effect the purchase. Zebra's majority shareholders were Orrin Tolliver and Otis Rush, the program director and music director of WZAK–FM, respectively. The minority shareholder was Xenophon Zapis, the owner of WZAK. Funding for the purchase was provided in part by a $250,000 loan from Zapis to Tolliver and Rush.

The proposed sale raised concerns in the Cleveland African–American community. The terms of the loan led to a belief among some that there was a high probability Tolliver and Rush would default, thereby giving Zapis control of the WJMO stations as well as WZAK. The stations are oriented toward African–American listeners and control a large share of that audience. Zapis's common ownership of the radio stations would give him a virtual monopoly over the dissemination of news, community affairs information, and music programming to the African–American community.

A petition objecting to the sale was filed with the Federal Communications Commission ("FCC") by the Southern Christian Leadership Conference and individual leaders of Cleveland's African–American community. Neither the Cleveland chapter of the NAACP nor Burkes was a signatory.

In an effort to resolve the dispute, George Forbes, the President of the Cleveland chapter of the NAACP, asked Ronald Adrine, the First Vice President of the Cleveland NAACP chapter, and Burkes to investigate the objections raised by the petitioners. A meeting was held at Burkes's office between some of the petitioners and the proposed buyers of the radio station. Toward the end of the meeting, Burkes told the buyers, Tolliver and Rush, that if they got into trouble with the loan, they should to come to see him before defaulting. Another meeting was scheduled for the parties and the NAACP and representatives.

The day before that meeting was to be held, R.J. Stidham telephoned Adrine. Stidham, an attorney, was assisting Rush and Tolliver in resolving the dispute with the petitioners. Stidham related that he had been informed that Burkes was telephoning the advertising manager of WZAK and offering to make the petition go away in return for stock and a reduced advertising rate for his corporation. Adrine considered the allegations to be serious. He called Pauline Tarver, the Executive Director of Cleveland's NAACP chapter, and repeated to her the information received from Stidham. Adrine also contacted Forbes regarding Burkes's alleged statements.

Tarver contacted Burkes and related the statements attributed to him by Stidham. Burkes denied ever making the statements. WZAK's advertising manager confirmed that Burkes had not made the statements. Tarver informed Adrine and Stidham that Burkes denied making the statements.

The meeting scheduled for the day following Stidham's initial conversation with Adrine never took place. It was cancelled on the advice of David Honig, an attorney representing the NAACP on FCC legal issues. Tarver had contacted Honig. He was concerned that the alleged statements might lead to liability on the part of the NAACP. Honig advised Tarver to send a letter on behalf of the NAACP disavowing any involvement with the alleged statements.

An executive meeting was held not long after. Appellants produced a transcript which they aver is of the executive meeting. According to the transcript, Adrine addressed the issue of the proposed radio station sale. Adrine stated that he wished that Burkes were present and that he did not want to make any allegations he could not back up before hearing Burkes's side of the situation. When pressed regarding the allegations, Adrine stated:

"The upshot of this is that there were some allegations that Caesar was trying to negotiate some 'tit for tat' to be an advocate for his McDonald's business, and, um, he said, he said that he didn't do it. You know I would just like to hear his explanation. The point is that the other side, being Zapis, it is now alleged that some improper influence being exercised by some of us in the branch or through the branch, as officers, to try to influence an FCC, uh, situation. And that as a result of that, and because of that alleged interference with their deal that those who had a meeting with Tolliver and Rush could be subject to some sort of civil liability. And, uh, we had had the first meeting, I thought went very well, we were talking about what we thought needed to happen to protect the community and to protect Rush and these people from being, you know, straw men, and that those were the two things we were most concerned about, and that they should come forward with some kind of a rearrangement of the package that would address those concerns that certainly, you know, we would be in favor of black owners having themselves a majority ownership position in a radio station here in Cleveland. So they were then going to bring Zapis back into the deal so we could address those concerns directly with him, and the day before that happened I got the call from R.J. telling me that the word that he had gotten from Zapis was that there had been these side conversations, and so at that point I told R.J. that, uh, you know, I need to talk to some other folks. I talked to Pauline; Pauline in turn talked to Honig. Honig called me that night and told me what his concerns were as to how that could play back on him as the _____ and could ultimately fall back on the branch. I in turn hooked him up with George. We had conversations. I called Pauline back and told her to cancel the meeting. And then that was the end of that. And now, in the last week, all kinds of stuff has been swirling around because I have been contacted by R.J. Somebody has been trying to get through to me or to me from Zapis through my Dad, you know, about sitting down and continuing the meeting, and (inaudible). I am now very

insecure with that, and now the only way for that to happen is if the lawyers from both sides are present so that we can have a full and open discussion and everyone can have their piece on the table. The key seems to be that FCC you know, is talking about a full hearing, is talking about making a ruling with regard to that within the next fourteen days, and Honig is in Hawaii for the majority of that period of time because of the fact that his father is very sick and we can't even get a sit-down until he gets back. So apparently their answer on the other side * * *."

Burkes and his corporation, C.B. Management Company, Inc., filed a complaint against Stidham and Adrine for slander and intentional infliction of mental distress. The claims were based on conversations Stidham had with Adrine and Adrine's repetition of that information to Tarver, Forbes, and at the Executive Committee meeting. The trial court granted summary judgment for the defendants on both claims.

## II

Appellants' first, second, third, and fifth assignments of error will be addressed together as similar issues of law and fact are involved. In the assignments of error, appellants dispute the entry of summary judgment for Adrine on the claim of defamation.

Civ.R. 56(C) provides that summary judgment is proper if the trial court determines that:

(1) No genuine issue as to any material fact remains to be litigated;

(2) the moving party is entitled to judgment as a matter of law; and

(3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

Summary judgment is a procedural device designed to terminate litigation and to avoid a formal trial where there is nothing to try. *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 24 O.O.3d 1, 433 N.E.2d 615. Summary judgment is not appropriate where the facts are subject to reasonable dispute when viewed in a light favorable to the nonmoving party. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 104, 19 OBR 261, 264, 483 N.E.2d 150, 154. It should be awarded with caution only after doubts are resolved and evidence construed in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 604 N.E.2d 138. The nonmoving party must produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd.*

*of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus.

A defamation claim requires the plaintiff to establish that the statement made to a third person was actionable. *Smith v. Ameriflora 1992, Inc.* (1994), 96 Ohio App.3d 179, 184, 644 N.E.2d 1038. The false publication must cause injury to the plaintiff's reputation, expose him to public hatred, contempt, ridicule, shame or disgrace, or affect him adversely in his trade or business. *Ashcroft v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 359, 365, 588 N.E.2d 280. The recipient must have understood the defamatory meaning of the published statement. *Smith, supra.* It is a question of law whether a statement is capable of carrying a defamatory meaning. *Stow v. Coville* (1994), 96 Ohio App.3d 70, 74, 644 N.E.2d 673, 675.

Appellants argue that there were numerous instances of material fact in dispute making a determination by summary judgment inappropriate. Appellants point to statements allegedly made by Burkes at an earlier meeting in 1992. Those statements are not part of appellants' defamation claim. Appellants object to Adrine's statement that he was asked by Forbes to chair a committee to resolve the petition dispute while Burkes volunteered to work on the committee. Appellants point to some alleged discrepancies between Stidham and Adrine as to exactly what Stidham told Adrine. Appellants also argue at length regarding discrepancies in depositions and sworn statements as to what was said at the Executive Committee meeting.

This court has accepted appellants' version of the facts as true for purposes of this appeal. Therefore, what was said at the Executive Committee meeting is not in dispute. Appellants' instances of disputed facts are not material to resolving the defamation claim. A material fact depends on the substantive law of the claim being litigated. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–2510, 91 L.Ed.2d 202, 210–211. A dispute of fact is "material" if it affects the outcome of the litigation, and is "genuine" if manifested by substantial evidence going beyond the allegations of the complaint. *Fiumara v. Higgins* (D.N.H.1983), 572 F.Supp. 1093, 1099. A material fact is an essential element of the claim or defense, as defined by the substantive law. Except for appellants' argument as to what was said at the Executive Committee meeting, none of the other alleged instances of disputed facts need to be resolved in order to prove or disprove the defamation claim. The disputed facts are not material. Appellants' version of what statements were made at the meeting has been accepted as true so there is no dispute over facts to resolve.

Appellants also argue that Adrine was not privileged to make the statements. Some statements may meet all the elements of defamation yet not

be actionable or only be actionable under certain circumstances because the statements are absolutely or conditionally privileged. *Stow, supra,* 96 Ohio App.3d at 73, 644 N.E.2d at 675. A statement which is afforded absolute privilege is completely protected. A qualified or conditional privilege affords protection only in the absence of ill will or malice. The defense of privilege is a matter of public policy in furtherance of the right of free speech. *Costanzo v. Gaul* (1980), 62 Ohio St.2d 106, 108–109, 16 O.O.3d 134, 135, 403 N.E.2d 979, 981–982.

The defense of absolute privilege is generally limited to legislative and judicial proceedings, and other acts of state. *Id.* The public policy is to ensure complete freedom of expression regardless of motive. A qualified privilege is applied to situations of intermediate importance. The immunity is conditioned upon publication in a reasonable manner and for a proper purpose. It has been applied to statements which concern a matter of common interest to the publisher and recipient which is furthered by the communication. *Gray v. Gen. Motors Corp.* (1977), 52 Ohio App.2d 348, 351, 6 O.O.3d 396, 398, 370 N.E.2d 747, 750.

In *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 72 O.O.2d 134, 331 N.E.2d 713, the court addressed the issue of a qualified privilege:

"In an action for defamation, the plaintiff's prima facie case is made out when he has established a publication to a third person for which defendant is responsible, the recipient's understanding of the defamatory meaning, and its actionable character [footnote omitted]. Defendant may then invoke various defenses, if available. One of these is known as 'qualified privilege,' in which the interest that the defendant is seeking to vindicate is conditioned upon publication in a reasonable manner and for a proper purpose. It is also referred to as a conditional privilege. As Prosser states in his Law of Torts (4 Ed.) 786, Section 115: ' * * * It is difficult to reduce the cases to any single statement, and perhaps no better formula can be offered than that of Baron Parke [footnote omitted] that the publication is privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." '

"A qualified privilege is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it. Frequently, in such cases, there is a legal, as well as a moral, obligation to speak [footnote omitted]. This is most obvious in the case of those who have entered upon or are considering business dealings with one another [footnote omitted].

"As stated in 50 American Jurisprudence 2d 698, Libel and Slander, Section 195:

" 'Conditional or qualified privilege is based on public policy. It does not change the actionable quality of the words published, but merely rebuts the inference of malice that is imputed in the absence of privilege, and makes a showing of falsity and actual malice essential to the right of recovery.

" 'A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. *·The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.' "* (Emphasis added.) 43 Ohio St.2d at 243–244, 72 O.O.2d at 138–139, 331 N.E.2d at 718–719.

Once a qualified privilege is shown, the plaintiff must show the untruth of the statements and actual malice in order to defeat the privilege and justify a trial on the merits. *Smith, supra,* 96 Ohio App.3d at 185, 644 N.E.2d at 1042. The proof of actual malice is shown with clear and convincing evidence. *Mosley v. Evans* (1993), 90 Ohio App.3d 633, 636, 630 N.E.2d 75, 77. Actual malice is defined as "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus. Although the existence of a qualified privilege in a defamation action is a mixed question of law and fact, it may be resolved by summary judgment in appropriate cases. *Black v. Cleveland Police Dept.* (1994), 96 Ohio App.3d 84, 89, 644 N.E.2d 682, 685.

 Appellants argue that Adrine failed to establish a defense of qualified privilege. They assert that Adrine was not privileged to inform the entire Executive Committee about the allegations, thereby making the publication excessive. Appellants maintain that Adrine acted with actual malice as he was reckless with regard to the truth or falsity of the statements. They argue that Adrine did nothing to verify whether Burkes made the statements. Adrine did not contact Burkes or the advertising manager of WZAK in regard to the allegations. Adrine was told before the executive meeting that Burkes vehemently denied making the statements. Adrine should have doubted the accuracy of the statements as Burkes could not have made the petition go away. Both Burkes and the NAACP were not signatories.

Although the Cleveland chapter of the NAACP was not a signatory to the petition, it apparently assumed the role of mediator in the dispute. Adrine and

Burkes were actively involved in the mediation process. The alleged offer by Burkes to make the petition go away in return for some consideration could have brought the NAACP's efforts to resolve the issue into question if it appeared that its second vice president was attempting to misuse his position. In the transcript of the executive meeting provided by appellants, Adrine stated that he wished that Burkes were there in order to hear his side of the story. Adrine discussed the allegations after being asked by a member what the allegations were and about the NAACP's potential liability. The member stated that he understood that Burkes's explanation was denial. Adrine stated that Burkes was trying to negotiate some "tit for tat" to be an advocate for his business. Adrine then reported that Burkes said he didn't do it.

Adrine was the first vice president of the Cleveland chapter of the NAACP. He was either in charge of or heavily involved in the attempt to resolve the situation regarding the FCC petition. Adrine had an interest in ascertaining whether Burkes made the statements. There was concern that the NAACP would be liable if the statements were made. The members of the Executive Committee would be interested in being apprised of potential liability. Adrine did not go into detail as to what exactly was allegedly said. He made it clear that Burkes denied making the statements. The major concern appeared to be the potential liability and the effect on the negotiations. The matter was of interest to the members of the Executive Committee. Adrine did not give a detailed account of the alleged statements. He addressed proper parties only, as he told Tarver, Forbes, and the members of the Executive Committee. All would have a common interest in anything affecting the mediation over the radio station sale and about potential liability for the chapter. Therefore, Adrine met the elements of the qualified privilege of common interest.

Once Adrine established a qualified privilege, appellants had to bring forth evidence of actual malice. *Rinehart v. Maiorano* (1991), 76 Ohio App.3d 413, 602 N.E.2d 340. Appellants argued that Adrine was reckless with regard to the falsity of the statements as he could have contacted Burkes but did not. Also, Adrine was aware that Burkes denied making the statements. Appellants argue that they met the burden imposed by *Wing* by producing evidence by way of Burkes's deposition regarding his denial and Tarver's sworn statement in which she related that Adrine was informed of Burkes's denial and the advertising manager's denial as well.

Adrine's publication to the Executive Committee was not presented as truth that the statements were made. Adrine stated that the remarks were "allegedly" made and it was clear that Burkes denied making the statements. Appellants

never explain how Adrine was reckless with regard to the truth or falsity of the publication when Adrine did not represent the statements as being true anywhere in appellants' transcript of the meeting. Adrine did not act with actual malice if the statements are not represented as being true. Appellants presented no evidence of actual malice.

Appellants' first, second, third, and fifth assignments of error lack merit.

## III

In their fourth assignment of error, appellants contend that the trial court erred in granting summary judgment on the intentional infliction of emotional distress claim. Appellants assert that a material issue of fact exists as to whether Adrine's conduct was so outrageous as to justify their claim.

A claim for intentional infliction of emotional distress requires proof of the following elements: (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it. *Ashcroft, supra*, 68 Ohio App.3d 359, 588 N.E.2d 280. Serious emotional distress requires an emotional injury which is both severe and debilitating. *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759.

*Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666, used the description of extreme and outrageous conduct found in Restatement of the Law 2d, Torts (1965) 71, Section 46:

" ' * * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

" 'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. See Magruder, Mental and Emotional Disturbance in the Law of Torts, [49] Harvard Law Review 1033, 1053 (1936). * * *' " *Id.*, 6 Ohio St.3d at 374–375, 6 OBR at 426, 453 N.E.2d at 671–672.

Appellant argues that *Yeager, supra,* and *Reamsnyder v. Jaskolski* (1984), 10 Ohio St.3d 150, 10 OBR 485, 462 N.E.2d 392, both held that whether a defendant's conduct is outrageous enough to result in liability is a question of fact for resolution by a jury and not a matter of law permitting the court to determine the issue. A reading of both cases reveals no such holding. Indeed, the quote attributed to *Reamsnyder* is not found within the case. The court in *Yeager* was the first to recognize intentional infliction of emotional distress as a cause of action and reversed based on the lower court's holding that no such cause of action existed in Ohio. *Reamsnyder* partially affirmed the dismissal of a claim of intentional infliction of emotional distress as it found that the conduct of some of the defendants did not reach the level of extreme and outrageous conduct required by *Yeager.* This court has upheld summary judgment on an intentional infliction of emotional distress claim. See *Deoma v. Shaker Hts.* (1990), 68 Ohio App.3d 72, 587 N.E.2d 425. Appellants' contention that liability for the tort of intentional infliction of emotional distress is always a jury question is specious.

█ In their complaint, appellants claimed that Adrine's conduct caused Burkes to suffer serious emotional distress, including trauma and shock to his nervous system, chronic depression and phobia. No evidence of a severe and debilitating emotional injury ever was submitted to the trial court. There is no evidence that Burkes's mental anguish was so severe that no reasonable person could have endured it. Nothing in the record reflects conduct by Adrine that was so outrageous as to be beyond all possible bounds of decency. Adrine brought a situation that might have resulted in liability for the NAACP to the attention of its president, executive director, and Executive Committee. Adrine made it clear that Burkes denied the allegations. Appellants do not argue in what way the conduct was outrageous; they argue only that it is a jury question.

Appellants have presented no evidence to meet any of the elements of a claim of intentional infliction of emotional distress. The trial court did not err on granting summary judgment for Adrine on this issue.

Appellants' fourth assignment of error is overruled.

## IV

██ In their sixth assignment of error, appellants contend that the trial court erred in granting summary judgment for Stidham. Stidham requested leave to file his motion for summary judgment but did not then file his summary judgment motion.

A review of the record shows that Stidham attached a copy of his summary judgment motion to his request for leave to file. In the motion for summary judgment attached to the request for leave to file, Stidham adopted the arguments set forth in Adrine's motion for summary judgment. After the trial court granted his request, Stidham did not then file the motion.

It was within the discretion of the trial court to deem the motion attached to the request as being filed. Because Stidham adopted the arguments of Adrine, appellants were not prejudiced by not having thirty days in which to file a response brief. Appellants already filed a brief in response to Adrine's motion for summary judgment.

Appellants' sixth assignment of error is overruled.

The judgment is affirmed.

*Judgment affirmed.*

DYKE and McMONAGLE, JJ., concur.