RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DANE CHISHOLM (19-3034) AND REID LINNINGER (19-3100), former student-athletes of St. Marys City Schools,

*Plaintiffs-Appellants*,

*v.*

ST. MARYS CITY SCHOOL DISTRICT BOARD OF EDUCATION, SHAWN BROWN, JAMES HOLLMAN, AND PAUL DOUGLAS FRYE,

*Defendants-Appellees*.

Nos. 19-3034/3100

---

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
Nos. 3:16-cv-02849; 3:16-cv-02853—James G. Carr, District Judge.

Argued: October 17, 2019

Decided and Filed: January 7, 2020

Before: ROGERS, WHITE, and READLER, Circuit Judges.

---

## COUNSEL

**ARGUED:** Mark A. Weiker, ALBEIT WEIKER, LLP, Columbus, Ohio, for Appellants. Tabitha Justice, SUBASHI, WILDERMUTH & JUSTICE, Dayton, Ohio, for Appellees St. Marys, Shawn Brown, and James Hollman. William V. Beach, ROBISON, CURPHEY & O'CONNELL, LLC, Toledo, Ohio, for Appellee Paul Douglas Frye. **ON BRIEF:** Mark A. Weiker, ALBEIT WEIKER, LLP, Columbus, Ohio, for Appellants. Tabitha Justice, Brian L. Wildermuth, SUBASHI, WILDERMUTH & JUSTICE, Dayton, Ohio, for Appellees St. Marys, Shawn Brown, and James Hollman. William V. Beach, Amy J. Luck, ROBISON, CURPHEY & O'CONNELL, LLC, Toledo, Ohio, for Appellee Paul Douglas Frye.

READLER, J., delivered the opinion of the court in which ROGERS, J., joined, and WHITE, J., joined in part. ROGERS, J. (pg. 17), delivered a separate concurring opinion in

which WHITE, J., joined in all but the first sentence.  WHITE, J. (pp. 18–20), delivered a separate opinion dissenting from Part II(B) of the majority opinion.

————————————

**OPINION**

————————————

CHAD A. READLER, Circuit Judge.  Playing football is not for the fainthearted.  During games, players risk physical injury in the name of beating an opponent.  Even at practice, players put their physical wellbeing at risk to compete for starting positions and to gain an edge for an upcoming game.

These competitive desires are often spurred on by a team's coach.  As much as in any sport, football coaches push their players to achieve, often in the face of adversity.  Through their words and actions, many coaches push quite hard.  Sometimes, their efforts can cross lines of decency.  Can they also cross legal lines drawn by Title IX of the Education Amendments Act?

All of this sets the backdrop for today's contest, one fought not on the field, but in the courtroom.  We are asked to decide whether federal or state law limits the types of verbal motivational tactics a high school football coach may employ.  In separate suits below, two former players for the St. Marys (Ohio) Memorial High School Football Team brought claims for federal Title IX violations and state-law intentional infliction of emotional distress against their coach, Defendant Doug Frye.  The players claim that Frye harassed them by using numerous derogatory terms—most notably, the term "pussy"—with the intent to insult (and presumably to motivate) the two in front of their teammates.  Plaintiffs also sued the St. Marys school board, superintendent, and athletic director for failing to address Frye's conduct.  In both suits, the district court entered summary judgment in favor of Defendants.  Plaintiffs now bring separate appeals, which we have consolidated for review.

As a matter of decency, Frye's conduct was distasteful, and no doubt offensive to many.  But as a matter of law, his conduct did not constitute sex-based discrimination, in violation of Title IX, nor was it conduct intolerable in a civilized society, in violation of Ohio tort law.  Accordingly, we **AFFIRM** the judgment of the district court.

# I. BACKGROUND

Baseball may forever be considered "America's pastime"—Levi Stahl, *When and how baseball became America's Pastime*, *The Chicago Blog* (Oct. 4, 2018), https://pressblog.uchicago.edu/2018/10/04/when-and-how-baseball-became-americas-pastime-an-interview-with-david-rapp.html—but by most every measure, football has become the nation's most popular team sport. Of America's professional sporting leagues, the National Football League enjoys the highest viewer ratings, with its annual championship game, the "Super Bowl," among any year's most viewed television programs of any kind. By total attendance figures, college football surpasses its professional counterpart, with fans filling over 100 collegiate stadiums every fall Saturday. High school football similarly captures the interest of fans in communities across the nation, typically on Friday nights, as a precursor to collegiate football Saturdays and professional football Sundays.

That widespread adulation informs at least two underlying features of today's case. First, football's popularity can be attributed in part to the sport's physical nature. Dating back to the violent gladiator games of Ancient Rome, and likely much earlier, spectators have long enjoyed tests of strength, speed, and aggression, even when the participants risk their health and wellbeing. More than any other modern team sport, football highlights these same traits—strength, speed, and aggression. It draws upon the combative nature of its participants and their coaches, with the sport enjoying a competitive, confrontational, and motivational foundation not seen in other team activities.

Second, football's popularity feeds a strong desire for team success. At the professional and collegiate levels, on-field success translates directly into notoriety for teams, players, and coaches, and significant revenue for the respective professional organization or university. Even in the more localized high school setting, community pride and year-long bragging rights are at stake when one's team takes the field. Facing this pressure to succeed, football teams are sometimes willing to take chances on troubled yet talented players, decisions that may otherwise be difficult to rationalize. And the same can be said of coaches, whose sometimes crude or outlandish antics are tolerated in favor of on-the-field success. Today's case reflects one such example.

**A.      *Frye Has A Turbulent Background As A High School Football Coach.***

Doug Frye has been coaching high school football in northern Ohio for a quarter-century. Allegations that Frye harassed players under his watch are nearly as old. The first came in 1995. While coaching at Bucyrus City Schools, Frye was given a written reprimand for "using unacceptable obscene language" and "becoming physical with one of the players."

That conduct repeated itself when Frye took a coaching position at St. Marys City Schools, starting in 1998. Just a year into the job, Frye was rebuked in writing by members of his coaching staff for subjecting his players to degrading language and pushing them to play through injuries. One of those coaching colleagues was James Hollman, then an assistant football coach, now the athletic director of St. Marys City Schools.

Frye left his position at St. Marys in the spring of 2010. That fall, he took a position as head high school football coach in neighboring Wapakoneta. And once again, Frye's behavior became the source of player grievances. In 2012, Frye was accused of harassing Wapakoneta players. Several students even went so far as to file a criminal complaint against Frye. These allegations were supported by a recording of Frye swearing repeatedly and calling his players "pussies," among other derogatory names.

An investigation by the Ohio Department of Education, or "ODE," ensued. That investigation resulted in ODE and Frye entering into a consent agreement. Under the agreement, Frye retained his teaching license and coaching permit. But Frye's employer, for two years, was required to submit quarterly reports to ODE addressing Frye's behavior and treatment of students. Wapakoneta then renewed Frye's position as head coach for the 2013 season. But following the season, Frye voluntarily resigned.

**B.      *Frye Returns To St. Marys And Becomes Plaintiffs' Coach.***

As events unfolded in Wapakoneta, ten miles away at St. Marys Memorial High School, Plaintiffs Dane Chisholm and Reid Lininger began their high school football careers. Both players were highly involved in the school football program. Chisholm played on the offensive

and defensive lines for the varsity team while Lininger was the starting quarterback for the junior varsity team.

During Plaintiffs' early years, the team struggled. Over the 2012 and 2013 seasons, the team went winless, posting a record of 0-20. And by and large, these games were not close. During those two seasons, St. Marys was outscored by a collective margin of nearly 3:1.

On the heels of that futility, the St. Marys School Board decided to replace the head coach. To fill the position, the Board turned to Frye, who was well known to St. Marys from his prior coaching tenure at the school and reputation for running a winning program. With full knowledge of Frye's history of disciplinary incidents, superintendent Shawn Brown signed off on Frye's rehiring due to Frye's continued successful employment for several years at other schools following complaints made against him.

The decision, however, divided the St. Marys community. Some community members enthusiastically supported Frye's rehiring. But others opposed rehiring Frye, given his troubled past. Mindful of these concerns, Brown resolved to monitor Frye's behavior. Brown tasked himself, along with Hollman, the district athletic director, to undertake that supervision.

### C.     *In His New Role, Frye Clashes With Lininger.*

Lininger claims that his negative relationship with Frye began immediately upon Frye's arrival at St. Marys. During the first months of Frye's renewed tenure, Lininger attended off-season weight-lifting sessions. At those sessions, Lininger stated that Frye called him soft and entitled. Though Frye also said similar things to other players, Lininger felt that Frye targeted him specifically by criticizing him in front of the entire team.

As the 2014 season kicked off, Frye did not relent. On a daily basis, Frye called Chisholm, Lininger, and their teammates various names, including "pussy, bitch, and pretty boy." Frye also continued to make an example of Lininger, complaining that it was impossible to win with players who wasted their talents like Lininger. Some of Lininger's teammates even joined in, calling Lininger a "pussy" and "soft."

Lininger eventually told his parents about the incidents. Lininger's mother contacted Hollman to ask how she could make a formal complaint against Frye. Hollman responded that he did not know how the complaint process worked, referring Ms. Lininger to Brown, the superintendent. Brown in turn referred Ms. Lininger back to Hollman. Ms. Lininger and Hollman never ended up speaking.

Ms. Lininger also separately contacted Travis Kuenning, a member of the St. Marys Board of Education, to inquire about the complaint process. Though Kuenning met with Ms. Lininger and offered to set up a one-on-one meeting between her and Frye, no such meeting ever took place.

### D. *Frye Has A Contentious Relationship With Chisholm.*

Unlike Lininger, Chisholm did not clash with Frye during Frye's first season back at St. Marys. But Chisholm had other problems. Off the field, he got into trouble at school. And on the field, he was ejected from a game for punching a player on the opposing team "a couple of times." Chisholm was even briefly removed from the team after he was caught smoking on school grounds. Though Chisholm was ultimately allowed back on the team, Frye made clear that similar conduct would not be tolerated. To his credit, Chisholm for a time heeded this warning, improving his behavior and becoming a team captain for the 2015 season, his senior year.

But his relationship with Frye quickly soured. According to Frye, Chisholm started openly questioning Frye's coaching methods. Frye responded by again calling Chisholm names at practice. This conflict came to a head after the penultimate game of St. Marys' season, when Frye and some team members accused Chisholm of throwing the game by intentionally misdirecting a snap. Following this incident, Chisholm's teammates "voted him off" the team, a decision Frye and Hollman, the athletic director, allowed to stand.

### E. *Plaintiffs' Fathers File A Formal Complaint, And The School Board And ODE Investigate.*

Following Chisholm's removal from the team, Chisholm's father contacted Lininger's father to discuss Frye's treatment of their sons. Chisholm's father also reached out to other

members of the team, finding some who agreed with the two fathers' complaints. After speaking with other parents about Frye's conduct, the two fathers decided to engage an attorney. At the fathers' behest, their attorney sent a letter to Brown and Hollman requesting the removal of Frye and his staff, both as coaches and teachers. The fathers also submitted a similar complaint to ODE.

The St. Marys School Board initiated an investigation into Frye's conduct. The Board retained Dr. Ted Knapke, the former superintendent of two Ohio school districts, who had previously conducted a similar investigation for another district. *Lininger v. St. Marys City Sch. Dist. Bd. of Educ.*, No. 3:16-cv-2853, 2019 WL 188050, at *4 (N.D. Ohio Jan. 14, 2019). On behalf of the Board, Knapke interviewed eleven players and some of their parents, along with most of the coaching staff. But he did not interview Lininger or his father. In his report, Knapke concluded that the allegations against Frye, while serious, were unsupported by the findings of the investigation. Coaches and students acknowledged Frye's intermittent swearing, but, Knapke concluded, they did not believe Frye's conduct was inappropriate. Despite these findings, Knapke recommended that Hollman "remain very closely involved with" the football program.

Plaintiffs' fathers wrote a letter to Brown to request an appeal. Brown brought the letter to the attention of the Board, but no additional investigation was conducted. Two months later, ODE concluded its investigation. In its final report, ODE determined that no disciplinary action against Frye was necessary.

Following the controversy, Frye remained the head coach at St. Marys. Chisholm finished his senior year and enlisted in the Army. Still a junior, Lininger transferred to nearby Anna High School, where he played receiver for the varsity football team and was chosen for the homecoming court. Despite those achievements, Lininger claims that he suffered severe emotional distress for the remainder of his time in high school.

F.     *Plaintiffs File Suit Against Various Members Of The St. Marys School District.*

Through the same counsel, Plaintiffs filed separate complaints in federal court. Each alleged federal Due Process, Equal Protection, 42 U.S.C. § 1983, and Title IX claims along with state-law claims for intentional and negligent infliction of emotional distress against the same

defendants—the St. Marys Board of Education, Brown, Hollman, and Frye.  Following discovery in each case, the district court granted summary judgment to Defendants on all claims.  Both Plaintiffs appealed, pursuing only their claims for Title IX violations and intentional infliction of emotional distress.  We consolidated the cases for resolution on appeal.

## II.  ANALYSIS

Viewing the record in the light most favorable to Plaintiffs, the district court concluded that Plaintiffs' Title IX and intentional infliction of emotional distress claims were insufficient as a matter of law.  Reviewing those conclusions de novo, we agree.  *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 444 (6th Cir. 2009) (citing *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)).  Even accepting Plaintiffs' factual allegations as true, they are nonetheless insufficient as a matter of law to warrant relief.

> A.     *Plaintiffs Are Not Entitled To Title IX Relief Because They Were Not The Target Of Sex-Based Discrimination.*

1.     Inspired by the Civil Rights Act of 1964, Congress passed another groundbreaking antidiscrimination law, Title IX, a few years later, in 1972.  In enacting Title IX, Congress sought to curb discrimination in federally funded educational institutions (such as public high schools and universities) left unaddressed by the Civil Rights Act.  20 U.S.C. § 1681(a).  Unlike its landmark predecessor, however, Title IX prohibits only discrimination "on the basis of sex": "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  *Id.* (emphasis added).  Other forms of discrimination, while they may run afoul of another safeguard, do not implicate Title IX.  *See id.*

To sustain a claim under Title IX, a plaintiff must first show that a person or entity affiliated with a federally funded education program engaged in some form of sex-based discrimination against the plaintiff.  Once those threshold matters are established, the plaintiff must make three additional showings: (1) the sex-based harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational

opportunities or benefits provided by the school; (2) the school had actual knowledge of the harassment; and (3) the school was deliberately indifferent to the harassment. *Patterson*, 551 F.3d at 444–45 (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)).

Plaintiffs' Title IX theory is somewhat unusual. It hinges entirely on Frye's use of the term "pussy." Plaintiffs say the use of that term was a form of sex discrimination due to its gender-based connotations. To Plaintiffs' mind, the term portrayed them as "feminine" and thus seemingly less valuable teammates in the "masculine" setting of football, revealing Frye's favoritism of one sex over the other. And because, Plaintiffs add, Frye's repeated use of the term ultimately denied them educational benefits at St. Marys, Frye's conduct ran afoul of Title IX. We therefore must decide whether a high school football coach's use of the term "pussy"—in the context of football-related activities—is enough to implicate Title IX protections.

2.     We start with the traditional understanding of sex discrimination. In crafting our framework for analyzing Title IX claims, we have looked to the Title VII landscape for guidance, as both statutes prohibit discrimination on the basis of sex. *Compare* 20 U.S.C. § 1681(a) (forbidding educational discrimination "on the basis of sex"), *with* 42 U.S.C. § 2000e-2 (forbidding employment discrimination "because of [an] individual's . . . sex"). Indeed, on more than one occasion, we have drawn parallels between sex discrimination in the educational setting under Title IX and sex discrimination in the workplace under Title VII. *See, e.g.*, *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 515 (6th Cir. 1996)). Accordingly, we begin our analysis by borrowing from our Title VII precedent to examine whether Frye's comments constituted discrimination "on the basis of sex," for purposes of Title IX.

In the Title VII context, a plaintiff customarily may use any one of three evidentiary routes to show that workplace discrimination occurred on the basis of sex: (1) the defendant made sexual advances or acted out of a sexual desire; (2) the defendant was motivated by general hostility to the presence of one sex in the workplace; or (3) the defendant treated members of each sex differently in a mixed-sex workplace. *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 765 (6th Cir. 2006) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998)).

Replacing the workplace setting with an educational one, the same three considerations provide a legal structure for examining Title IX sex-discrimination claims.

Viewed through this Title VII-inspired lens, Plaintiffs' allegations fail to satisfy any of the three traditional routes for establishing Title IX liability. Start with the first route—whether Frye made sexual advances or acted out of sexual desire. Even when viewing the record in the light most favorable to Plaintiffs, that type of evidence is absent. In fact, no allegation regarding sexual desire has been raised in this case. The same is true of the second route—whether Frye was motivated by a general hostility to the presence of men. If anything, the evidence is much to the contrary. Frye, after all, dedicated many years of his life to coaching and developing the male student athletes he supervised. So too for the third route—whether Frye treated men and women differently in a mixed-sex environment. That the St. Marys football team had no female members seems to foreclose this route to Title IX relief. And even looking beyond the football field to school activities more broadly, Plaintiffs have not presented any evidence that Frye treated male and female students any differently.

Of course, Plaintiffs cannot be faulted for finding Frye's use of the term "pussy" offensive, even in a football setting. But crude or vulgar language alone does not rise to the level of a Title IX violation. After all, Title IX, like Title VII, is not a "general civility code." *See Oncale*, 523 U.S. at 81. Plaintiffs may also be correct that Frye used the term as an assault on their masculinity. To Frye, the term was a vehicle for criticizing male athletes for not acting in an aggressive or "tough" manner. Yet the mere use of an offensive or gendered term does not in itself rise to the level of discrimination on the basis of sex. *See Oncale*, 523 U.S. at 81 ("[The plaintiff] must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discrimina[tion]* . . . because of . . . sex.") (original emphasis). Here, Frye's aim was to chide Plaintiffs for not acting with the forcefulness Frye believed was called for on the football field. Critically, there is no evidence of Frye favoring one sex over the other in that respect. That shortcoming dooms any claim for relief under the traditional understanding of Title IX. *Cf. Seamons v. Snow*, 84 F.3d 1226, 1233 (10th Cir. 1996) (holding that a football coach's use of offensive gendered language toward a player was not sex-based discrimination for purposes of Title IX).

3.     Outside of these traditional applications of Title VII and Title IX, a plaintiff can also demonstrate sex discrimination by showing that he or she was mistreated for failing to conform to traditional sex stereotypes.  The seminal Supreme Court case on that score, *Price Waterhouse v. Hopkins*, involved a female employee of an accounting firm who was explicitly instructed to look and act more feminine to improve her chances of a promotion.  490 U.S. 228, 235 (1989).  Among those clichéd instructions, the employee was told to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry," and to behave less "aggressively" with firm staff.  *Id.*  These traits, of course, had no relevance to the performance of her job duties.  And, it bears noting, these traits were not expected of the firm's male employees.  *Id.*  Rather, this "advice" and the ensuing adverse employment outcome were the result of Price Waterhouse's stereotypical views about how a woman should look and behave in the workplace.  In that way, the company's conduct likely ran afoul of federal protections against sex discrimination.  That is, unless Price Waterhouse could prove that it would have denied the plaintiff a promotion absent the discrimination, the plaintiff was entitled to Title VII relief on the basis of impermissible "sex stereotyping." *Id.* at 250–51.

Following *Price Waterhouse*'s lead, we granted relief to a transgender plaintiff who was mistreated by her employer, the City of Salem, while transitioning.  *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004).  As Smith took progressive steps to appear and act more feminine, Smith's city co-workers complained that Smith's appearance was "not masculine enough." *Id.* at 572.  Ultimately, top city officials conspired to constructively terminate Smith by ordering Smith to undergo multiple psychological examinations, which they hoped Smith would refuse, leading to Smith's removal.  *Id.* at 569.  As the city's actions emanated from their formulaic thinking about how men should appear and behave in the workplace, their conduct toward Smith, we concluded, violated Title VII's prohibition on sex stereotyping.  *Id.* at 575.

For today's purposes, and again borrowing from our Title VII jurisprudence in interpreting Title IX, *Smith* instructs us to consider whether Plaintiffs' gender non-conforming appearance or behavior motivated Frye's comments, giving rise to a potential violation of Title IX.  *See Vickers*, 453 F.3d at 763 (citing *Smith*, 378 F.3d at 573).  We can quickly rule out the former; Plaintiffs have not alleged that they did not have a traditionally male appearance.  So we

are left to consider whether Frye's gendered comments about Plaintiffs' behavior might implicate Title IX's prohibition of sex stereotyping, as a form of sex discrimination. In our view, they do not.

Today's case falls well short of *Price Waterhouse* and *Smith* terrain, for two reasons. First, the comments at issue in those cases specifically targeted the plaintiffs' perceived failure to appear and act like a woman (in *Price Waterhouse*) or like a man (in *Smith*). In other words, those comments dealt with specific proscriptive gender norms that the plaintiffs were perceived to have violated—for example, that men do not wear feminine clothing. But compare those gender-based comments with Frye's. Frye criticized Chisholm and Lininger in a crude, foul-mouthed way because they, in his view, were not "tough" enough. Toughness, while sometimes celebrated in men, is certainly not discouraged in women, especially in a professional or team setting. Indeed, in sports, law enforcement, business, law, politics, the armed services, and myriad other activities and professions, women are called upon to be as tough as men. And in many instances, women outpace their male colleagues in that respect. By the same token, were women to join Frye's team, he undoubtedly would demand nothing less of them than their male teammates. This is worlds apart, then, from the gender-inspired expectations about appearance (such as wearing makeup, jewelry, or certain hairstyles) that loomed large in *Price Waterhouse* and *Smith*.

Second, and of even greater significance, the qualities complained of in *Price Waterhouse* and *Smith* were not related to the plaintiffs' abilities to perform well in their jobs. Here, by comparison, Frye's abusive language targeted a fundamental requirement for football players—toughness. By his remarks, Frye was not offering a commentary on whether Chisholm and Lininger were exemplars of their sex. For better or worse, Frye's comments were about playing football, not gender roles. Frye thought that Lininger's performance as a quarterback suffered because of Lininger's fear of being hit by players on the opposing team. And Frye criticized Lininger for sitting out games and practices due to injury. To Frye's somewhat boorish mind, a "pussy" was a wimp or coward, perhaps a "snowflake" in the current lexicon, but, critically, not a feminine individual. As previously mentioned, gut-wrenching hits and other brutal interactions are part and parcel of football. With such interactions come pain and, all too

often, injury.   Resilience, a strong will, and possibly even a measure of disregard for one's physical well-being, are necessary ingredients for success in football.   And that is true for male and female players alike.

That resilience is the trait Frye sought to draw out of Lininger and Chisholm.   While beneath the dignity of a teacher and youth mentor, Frye's use of an offensive, gendered insult to motivate his players does not put this case across the Title IX goal line.   *See Vickers*, 453 F.3d at 764 (citing *Smith*, 378 F.3d at 575).

4.      Even if the use of the word "pussy," standing alone, could constitute a form of sex-based discrimination, Plaintiffs have still failed to meet the remaining elements of a Title IX claim.   Title IX does not protect against all sex discrimination.   Rather, it protects only against sex discrimination that is so "severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school." *Patterson*, 551 F.3d at 444–45 (citing *Davis*, 526 U.S. at 633).

To make that assessment, we must consider the context in which Frye made these comments.   *Oncale*, 523 U.S. at 82.   Plaintiffs were high school football players, and Frye was their coach.   Though the record suggests that Frye's use of profanity in general, and the term "pussy" in particular, was pervasive, Plaintiffs have not shown that Frye's statements were sufficiently severe or objectively offensive to merit Title IX relief.   On the football field, where emotions and adrenaline can run high, it is not unheard of for coaches and players alike to use offensive or gendered language, especially in the heat of a game.   Viewed in this light, Frye's conduct, while less than laudable, does not meet the high bar for severe, pervasive, and objectively offensive conduct.   *See Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 360, 363 (6th Cir. 2012) (holding that three separate occasions of sexual harassment—a male student shoving a female student into a locker, demanding that she perform oral sex on him, and making obscene sexual gestures at her—was not "severe, pervasive, and objectively offensive").

This conclusion, of course, might be different in another setting.   Conduct considered blasé on the gridiron might very well shock the conscience of the chess club or debate team.   The Supreme Court made precisely this observation in *Oncale*, when it stated that the evaluation of

conduct as sex-based discrimination "depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." 523 U.S. at 82. The constellation of circumstances surrounding today's case simply does not give rise to Title IX liability. And as a result, we need not consider whether the remaining Defendants were deliberately indifferent to Frye's conduct. *Pahssen*, 668 F.3d at 364.

        B.      *Plaintiffs' State-Law Claims Likewise Fail Because Frye's Conduct Was Not Sufficiently Outrageous, And Any Anguish Experienced by Plaintiffs Was Not Sufficiently Severe.*

In addition to their federal Title IX claim, Plaintiffs also claim that Frye's conduct amounted to intentional infliction of emotional distress, an Ohio state-law claim. According to Plaintiffs, Frye's conduct caused Lininger to develop depression and anxiety, which made it more difficult for him to make friends at his new school. Likewise, Plaintiffs say that Frye's comments and failure to reinstate Chisholm following his dismissal from the team disrupted his home life and caused him to be skeptical of adult leadership.

Under Ohio common law, a claim for intentional infliction of emotional distress requires Plaintiffs to meet a four-factor test:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;
>
> (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community;
>
> (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and
>
> (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio App. 1995). For purposes of argument, we assume that Frye, by his derogatory comments, intended to cause Plaintiffs emotional distress, the first in Ohio's four-factor test. We likewise assume the third factor—that Frye's conduct was the proximate cause of Plaintiffs' alleged mental anguish. Neither Lininger nor Chisholm,

however, can show that Frye's conduct was "so extreme and outrageous as to go beyond all possible bounds of decency," let alone conduct "considered as utterly intolerable in a civilized community," as required by the second factor. *Id.* Nor, for that matter, can either one show that the mental anguish resulting from Frye's conduct was so severe that no reasonable player could be expected to endure it, as required by the final factor. *Id.*

Ohio law sets a high bar for establishing an emotional-distress claim. To clear that bar, a plaintiff must show "outrageous" conduct by the defendant. Hurt feelings caused by insults, threats, and other indignities are not "outrageous" as a matter of Ohio law. *Reamsnyder v. Jaskolski*, 462 N.E.2d 392, 394 (Ohio 1984). Rather, as Ohio courts have recognized, and as we have all experienced, the world is not always kind, meaning that, for common-law tort purposes, the average person is expected to be somewhat thick-skinned. *Id.* With that understanding in mind, Ohio courts routinely deny claims for intentional infliction of emotional distress, even in cases of egregious conduct. *See, e.g.*, *Silvers v. Clay Twp. Police Dep't*, 117 N.E.3d 954, 965–67 (Ohio App. 2018) (denying relief to a plaintiff who, at the hands of her co-worker, was repeatedly teased about the sudden death of her sister, her weight, and her own health problems); *Pierce v. Woyma*, No. 97545, 2012 WL 3758631, at *6 (Ohio App. Aug. 20, 2012) (denying relief to a woman who was verbally berated by an off-duty police officer). That is true for everyday circumstances, let alone in the rough-and-tumble world of football.

That is not to say we condone Frye's comments. They are offensive and inappropriate at best. But they are also not unheard of on the gridiron, where the foul-mouthed coach is something of an unfortunate cultural cliché. All things considered, Frye's statements were not "utterly intolerable in a civilized community." *Burkes*, 668 N.E.2d at 989.

For similar reasons, we cannot say, as required by the final factor, that any emotional anguish Plaintiffs experienced was "serious and of a nature that no reasonable man could be expected to endure it." *Id.* As we have said, Frye's comments were harsh, pointed, and intended to demean. Yet even intense name-calling is not something "no reasonable man could be expected to endure," especially on the football field. *Id.*

All of this is particularly true with respect to Chisholm's claim regarding his removal from the team. As a starting point, it is unlikely that Chisholm's removal from participating in a voluntary team sport, even if wrongful, could be sufficient grounds for an emotional-distress claim. Ohio courts have denied emotional-distress claims brought by *paid employees* terminated even under the most acrimonious and embarrassing circumstances. *Peitsmeyer v. Jackson Twp. Bd. of Trs.*, No. 02AP-1174, 2003 WL 21940713, at *5–6 (Ohio App. Aug 14, 2003) (denying emotional-distress relief to a firefighter who was forced to sort through his personal belongings in front his co-workers after his locked office was emptied without notice). The same must be true of an unpaid recreational activity that was not Chisholm's means of supporting himself. Although Chisholm was likely humiliated when he was removed from the team, Ohio tort law does not reach all indignities. For better or worse, "embarrassment and humiliation are part of everyday life to which the law provides no remedy." *Id.* at *5.

This is perhaps especially so when the embarrassment and humiliation result from a justified action—here, Chisholm's removal from the team. Chisholm had been removed once before for smoking on school grounds. When he returned to the team, Chisholm punched an opponent multiple times during a game and engaged in other violent misconduct at school. And, keep in mind, it was Chisholm's own teammates who chose to remove him from the team after he was accused of throwing a game. Frye merely ratified this decision. Even if a more fulsome investigation might reveal that Chisholm's removal was unfair, it certainly was not so unfair as to be "utterly intolerable in a civilized community." *Burkes*, 668 N.E.2d at 989.

### III. CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.

---------------

**CONCURRENCE**

---------------

ROGERS, Circuit Judge, concurring.   I concur in full.  Title IX, a federal sex discrimination statute, simply does not prohibit abuse of students merely because a coach uses coarse language with a sexual connotation, like "pussy."

This of course is not to excuse abusive conduct like that attributed to defendant in this case.  Such conduct should not be tolerated in our high schools.  Motivation by humiliation, ridicule, and shaming is counterproductive, and sends terrible messages to our young people.  Good training can be very stressful, and tough—very tough—without such abuse.  Moreover, constant coarse language, a sign of insecurity, engenders disrespect more often than respect.  The way to root out such bad practices, however, is to rely on school boards, administrators, school councils, PTAs, and parents.  It is not to create a federal court action to curb such practices.  As the majority opinion explains, Congress has not done so.

---

**DISSENTING IN PART**

---

HELENE N. WHITE, Circuit Judge, dissenting in part. I concur in the court's opinion except as to section II(B), from which I respectfully dissent. I also join in all but the first sentence of Judge Rogers's concurrence.

I agree that consideration of the context surrounding Frye's behavior is necessary in determining whether Frye's treatment of Plaintiffs was extreme and outrageous. *See, e.g.*, *Stepien v. Franklin*, 528 N.W.2d 1324, 1330 (Ohio App. 1988). However, the majority overlooks important aspects of that context. This is not a case of a professional or collegiate football coach employing tough coaching methods to motivate consenting adults. Viewing the facts in the light most favorable to Plaintiffs, it appears instead that Frye used his position of authority to degrade, name-call, and single out minor students over an extended time and on a near-daily basis. Frye engaged in this name-calling in front of other impressionable students, who mimicked his behavior on and off the field. In Lininger's case, students followed in Frye's footsteps by calling Lininger "pussy" and "soft" or confronting him in the school hallway to tell him that "Coach Frye says you're a pussy." (R. 39, PID 1358, 1372.)[1] At times, Frye's name-calling was precipitated by what he apparently perceived to be a lack of toughness or, in Chisolm's case, insubordination; at others, Frye appeared to single Plaintiffs out for reasons having nothing to do with their efforts on the field. Viewed as a whole, Frye's behavior constitutes more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Reamsnyder v. Jaskolski*, 462 N.E.2d 392, 394 (Ohio 1984). I therefore conclude that there is sufficient evidence from which to conclude that Frye's actions were so extreme and outrageous as to fall outside the bounds of decency. *Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio App. 1995).

As the majority describes, Frye has a long history of similar abusive behavior toward student athletes in other districts and in St. Marys. Frye was reprimanded for using obscene

---

[1]All record citations are to the appellate record in Case No. 19-3100, *Lininger v. St. Marys School District Board of Education, et al.*

language and physicality as early as 1995.  During Frye's first tenure at St. Marys, members of his own coaching staff wrote a letter to the St. Marys Board of Education expressing their concerns about Frye's treatment of students.  When Frye moved to Wapakoneta schools, his behavior gave rise to several students filing a criminal complaint against him and a consent agreement with the Ohio Department of Education.  In short, during each of Frye's coaching tenures on the record, his actions gave rise to serious concerns, disciplinary actions, or formal complaints.  This supports the conclusion that his treatment of Plaintiffs fell outside the bounds of decency.  *Burkes*, 668 N.E.2d at 989.

As to the element of intent, the vulgar and derogatory nature of Frye's persistent targeted name-calling is alone enough for a jury to conclude that he intended to cause Plaintiffs emotional distress.  *See Meyers v. Hot Bagels Factory, Inc.*, 721 N.E.2d 1068, 1075 (Ohio App. 1999) ("The outrageousness of a defendant's conduct in and of itself can demonstrate his intent to cause emotional distress.").  If he did not so intend, his history of receiving complaints and reprimands as a result of the same behavior he displayed toward Plaintiffs put him on notice that his actions would cause serious emotional harm.  Likewise, Plaintiffs have created a factual dispute as to causation.  As the majority apparently concedes, Frye's treatment of Plaintiffs directly resulted in their emotional distress.  Although there may be factual issues as to what degree Frye's actions—as opposed to other events, including student bullying—caused that distress, those issues should be left to a jury to decide.

Finally, Plaintiffs have presented evidence sufficient to allow a reasonable jury to conclude "that the emotional distress actually suffered" as a result of Frye's behavior "reached the level of serious or debilitating emotional distress."  *Meyers*, 721 N.W.2d at 94.  Frye's treatment of Lininger had repercussions on and off the field, including bullying by his peers and loss of friends.  Eventually, he felt compelled to leave St. Marys and moved to a different school for his senior year.  The expert psychologist who examined Lininger reported that Lininger shared that he was "depressed," "withdrawn," "isolated," and "ostracized" from the St. Marys community.  (Appellant Lininger's Br. at 30 (citing R. 59).)  Lininger described feeling panic and anxiety as a result of Frye's treatment of him.  Lininger further testified that he was prescribed antidepressants and sought a counselor to help him cope with his feelings of anger

and sadness.     Similarly, Chisolm testified that the events underlying this case strained his relationships and caused him to distrust adults.  He described feelings of sadness and being unable to enjoy anything in his hometown.  The expert psychologist concluded that Chisolm experienced mental-health and psychological problems as a result of Frye's and the school's treatment of him.

In sum, there is sufficient evidence to support a finding in Plaintiffs' favor on each element of their intentional infliction of emotional distress claims against Frye, and I would reverse the district court's grant of summary judgment to Frye on those claims.